[Civil No. 2629.  Filed November 21, 1927.]

[261 Pac. 40.]

In the Matter of the Estate of ALEX SILVA, Deceased. NICOLASA VALENZUELA and ALEX SILVA, Jr., Appellants, v. MARY J. SILVA, Executrix of the Estate of ALEX SILVA, Deceased, Appellee.

574

Mr. Leon S. Jacobs and Messrs. Struckmeyer, Jennings & Strouss, for Appellants.

Mr. J. L. B. Alexander and Mr. Robert McMurchie, for Appellee.

ROSS, C. J.—Alex Silva, in his will dated April 26th, 1916, gave and bequeathed all of his property to Mary J. Silva, his wife. He died on December 10th, 1925. On January 25th, 1926, the will was admitted to probate and letters testamentary issued to Mary J. Silva. On November 12, 1926, and within one year after the will was probated, Nicolasa Valenzuela, formerly Nicolasa Silva, and Alex Silva, Jr., illegitimate children of deceased, filed a contest against the will alleging that it had been invalidated by chapter 114, Laws of 1921, entitled:

"An act declaring every child to be the legitimate child of its natural parents; making such child an heir of such parents and providing the procedure for establishing such parentage."

It is alleged by the contestants that they are the offspring and issue of Alex Silva, deceased, and one

Bartola Mendez, who were not married at the time, nor afterwards, and who never acknowledged or proclaimed themselves to be husband and wife. The contestants, respectively, are thirty-three and thirty-one years of age.

The demurrer to the contest petition was sustained and judgment dismissing the contest entered. The contestants have appealed and assigned the rulings as error.

There was no law of this state prior to the enactment of chapter 114 giving to persons occupying the status of contestants the rights of children born in lawful wedlock, or making them heirs of their father and, therefore, at the time Silva made his will it was not necessary that he take notice therein of the existence of contestants. In that regard the law in this jurisdiction was as under the common law, and as found in most, if not all, the states. Chapter 114 has radically changed the law as theretofore existing, and the duty of determining the extent of such change, and whether it embraces the contestants within its purview, falls to this court in the case presented. That the law has for its object the substitution of paternal responsibility, for children born out of wedlock, for paternal irresponsibility as heretofore existing, is evident. The difficulty is in determining from the language used what illegitimate children of a father were intended to be given the status of children born in wedlock; that is, whether it embraces within its folds those born, say, thirty-three or thirty-one years or longer before the law became effective, on down to that time, or whether it embraces only those children born out of wedlock since it became effective. The title of the act we have given above, and the act itself reads as follows:

"Section 1. Every child is hereby declared to be the legitimate child of its natural parents and

as such is entitled to support and education to the same extent as if it had been born in lawful wedlock. It shall inherit from its natural parents and from their kindred heir lineal and collateral in the same manner as children born in lawful wedlock as provided in paragraph ·1092, chapter 14, title 6, of the Revised Statutes of Arizona 1913, Civil Code.

"This section shall apply to cases where the natural father of any such child is married to one other than the mother of said child, as well as where he is single. Provided, however, this law shall not be so construed as to give to said child the right to dwelling or a residence with the family of its father, if such father be married.

"Section 2. The mother of any child born out of lawful wedlock may within one year after the birth of such child bring a civil action in the superior court to establish the parentage of such child. Such action shall be commenced by complaint filed by the mother as plaintiff against the alleged natural father as defendant, and summons shall be issued and served and the same proceedings had as in other civil cases. In such cases the parentage may be proved like any other fact.

"Provided, that the mother of said child shall not be considered a competent witness in any case where the alleged natural father of said child shall be dead at the time of the trial.

"Provided further, that a statement in writing may be made by the parents of said child, admitting the parentage thereof, and upon which a judgment may be entered.

"Section 3. This action shall be deemed cumulative as to the remedies contained in paragraphs 369 to 381, inclusive, Revised Statutes of Arizona 1913, Penal Code, relating to bastardy proceedings, but all children hereafter born in this state shall be deemed to be legitimate."

The act is not only novel but revolutionary in its effect, and, undertaking as it does to create new obligations and responsibilities, it seems should have been written with more care. The first sentence

says, "Every child is hereby declared to be the legitimate child of its natural parents," following out the first clause of the title to the act, and if this expression stood alone its meaning might be construed to embrace contestants and all children similarly situated, as also after-born children. But as a part of the same sentence is this clause, "And as such is entitled to support and education to the same extent as if it had been born in lawful wedlock." To these clauses must be ascribed their ordinary and usual meaning, if possible, but this cannot be done and effect given the general law that exempts the parent from supporting and educating his child after the latter has grown to manhood or womanhood. The period of the child's life during which support and education are legal obligations on the parent is his minority, or from his birth until by the law he is emancipated from the parental control. This, of course, the legislature knew, and, when it described those intended to be legitimized to be children entitled to support and education from the parent, it referred to "children" as that word is ordinarily understood. The word "child" or "children" has many different meanings, and, in arriving at what meaning is intended, attention must be given to the context in which it is used. It may, and, when used with respect to parentage, usually does, mean a child born in wedlock. 11 C. J. 750, §§ 1, 2, and 3. The subject of the present legislation, however, is a child born out of wedlock and not yet of adult age. It is a child not only entitled to support and education, but one who on account of its age is given "the right to dwelling or a residence with the family of its father," if single or married to the child's natural mother.

From what we have said it seems certain that the legislative intent was to legitimize and require the father to support and educate and give a home to,

or otherwise provide for, his children born out of wedlock, who, by reason of their tender years, need such care and who were born after a certain date, not perhaps directly or definitely mentioned in the act, but evidently well understood by the legislature.

In common parlance, when we speak of persons old enough to have been named, we designate them by the personal pronoun "he" or "she" and their declensions. During the period prior to a child's birth it is referred to by the neuter pronoun "it" or "its." The person who drafted chapter 114 and the legislature that enacted it evidently had in mind children in the latter classification. In the title of the act the antecedent of "its" is child, and in section 1 thereof child is referred to as "it" or "its." It is the common and natural thing to refer to the prenatal child by the neuter pronoun, and quite as natural and common to refer to it after birth and knowledge of sex by the personal pronoun. This restrictive meaning of the word "child" is indicated in all other parts of the act. In section 2 provision is made for the establishing of an illegitimate child's parentage within one year after its birth. A child born less than one year before chapter 114 was enacted would fall within the literal terms of the law, but one born more than a year before would be excluded, if the procedural feature of the act be construed as a remedy applicable to those born before the act was effective as well as those born afterwards. We would not convict the legislature of such partiality and say it intended to legitimize a child born eleven months and twenty-nine days and not one born twelve months and one day before the law was effective. The legislature obviously never intended such an absurdity any more than it intended to cover all children, of whatever age, of that class. What it evidently did intend to do, and did do, was to bring within its aegis those

children born out of wedlock after the act became effective.

We have made reference to the procedure provided to establish parentage for the sole purpose of showing that the mind of the lawmaker was directed to the protection of infants, and not grown-ups. We do not intend that it be understood that we think such procedure is exclusive, and that a child born out of wedlock cannot be legitimized except by an action instituted by the mother, or a statement in writing made by the parents admitting its parentage. It seems to us that the evident purpose of authorizing the mother to bring an action to establish the parentage of her child was to fix the father's legal obligation to support and educate the child. This must be so since section 3 makes such action a cumulative remedy to the action under the bastardy statute, the purpose of which is to compel the father to contribute to the support of his illegitimate offspring.

All we have said by way of reasons why it must have been intended by the legislature to limit the law's operation to children born after the act became effective is reinforced and buttressed by the last clause of section 3 where these very significant words are found: "But all children hereafter born in this state shall be deemed to be legitimate." This expression is, we think, the key to the legislative mind, and, though other expressions of the act may, when considered apart from it, leave one in doubt as to what children were intended to be affected, when viewed with it, and as a whole, all is as clear as the noonday sun.

Many other questions were argued by counsel, but most of them are directed to the validity of the will as affected by other provisions of the statute in case we held the act legitimized contestants. Hold-

ing against this contention, as we do, these questions become unimportant.

The contestants, not being within the purview of the law, could not maintain a contest of their father's will. It follows the court's rulings were correct.

LOCKWOOD and McALISTER, JJ., concur.