### In re BUFFINGTON'S ESTATE.

No. 22942.   Nov. 20, 1934.

Charles A. Chandler, Elliot D. Turnage, R. A. Wilkerson, and Ernest R. Brown, for plaintiffs in error.

R. M. Mountcastle, for defendant in error.

RILEY, C. J. This is an appeal from a judgment of the district court of Muskogee county, adjudging Lawrence Buffington to be a son and heir at law of William Buffington, deceased, who died intestate; and entitled to share equally with Mattie Buffington, surviving spouse of said William Buffington.

It appears that Lawrence Buffington was born about September, 1907. His mother was Rebecca Thomas, and at the time of the birth of the child the mother had never been married. The mother died the next day after the birth of the child.

The questions at issue are whether or not William Buffington was the father of said Lawrence Buffington, and if so, whether William Buffington ever adopted said child under the provisions of section 8057, C. O. S. 1921 (1715, O. S. 1931).

William Buffington died intestate November 30, 1929, and thereafter J. C. Howel was appointed administrator of his estate at the request of his widow, Mattie J. Buffington.

On November 12, 1930, the administrator filed his final account and petition for distribution, wherein he prayed the county court for a decree determining the heirs at law of William Buffington, deceased, and alleged therein that the only heirs at law were Mattie Buffington, widow, and Lawrence Buffington, son.

Protest was filed by Eliza Lehman et al., alleging that they were heirs in that they were brother and sisters or children of deceased brothers and sisters of said deceased, and denying that Lawrence Buffington was an heir, or that he was in fact the son of deceased, and asserting that William Buffington was the father of no children, legitimate or illegitimate, and that he had never acknowledged in writing his parenthood of any child, and that he never at any time, with or without the consent of his wife, took any child into his home and adopted it as his own and treated it as a member of his family, and alleging that they, two sisters, one brother, three nephews, and four nieces, together with the widow, Mattie J. Buffington, were the only heirs at law of said deceased.

Protest was also filed by D. L. Rashaw, as trustee for certain others claiming some remote interest in the estate.

A separate protest was filed by Corrine Lythcott and Alice Halbert, claiming to be heirs, as children of Amanda Haines, a deceased sister of William Buffington.

Hearing was had in the county court, resulting in finding Mattie J. Buffington, the surviving widow, and Lawrence Buffington to be the sole and only heirs, and an order distributing the entire estate to them in equal shares.

Appeal to the district court was taken by the brothers, sisters, nephews and nieces, where the issues between them and Lawrence Buffington were again tried, where special findings of fact and conclusions of law were to the same effect as in the county court, and judgment was entered declaring Mattie J. Buffington, widow, and Lawrence Buffington, son, to be the sole and only heirs at law of said William Buffington, deceased, and confirming and approving the findings and order of distribution of the county court, from which findings, order, and judgment this appeal is prosecuted.

The several specifications of error relied upon are in the briefs of plaintiffs in error grouped under two headings: That the decree is contrary to law, and that it is unsupported by the evidence.

Two questions of fact are involved, viz., whether or not Lawrence Buffington is the son of William Buffington, deceased, and if

so, was he adopted by William Buffington within the provisions of section 8057, C. O. S. 1921 (1715, O. S. 1931).

It was the view of the trial court that there was no credible testimony whatever to support the theory that any one other than William Buffington was the father of Lawrence. With this we fully concur, and deem it unnecessary to review the evidence on this point.

It was likewise the view of the trial court, and so stated in his findings of fact, that the evidence is overwhelming to the effect that William Buffington recognized Lawrence as his son.

The record is replete with evidence that William Buffington often publicly acknowledged Lawrence Buffington as his own son. In fact, there is evidence that he openly admitted parentage of the child before its birth, and often thereafter for nearly 20 years.

Section 8057, C. O. S. 1921 (1715, O. S. 1931), provides:

"The father of an illegitimate child by publicly acknowledging it as his own, receiving it as such, with the consent of his wife, if he is married, into his family, and otherwise treating it as if it were a legitimate child, thereby adopts it as such, and such child is thereupon deemed for all purposes legitimate from the time of its birth. The status thus created is that of a child adopted by regular procedure of court. The foregoing provisions of this article do not apply to such an adoption."

There is abundant evidence tending to prove that William Buffington treated Lawrence as if he were a legitimate child.

The question of receiving Lawrence into his home by William Buffington presents a more serious question.

Evidence, with little or no conflict, shows that sometime prior to May 25, 1909, William Buffington married one Maggie Kye, and thereafter lived in his own home with his wife in Fort Gibson. On or about May 25, 1909, when Lawrence was about 18 months old, the then wife of William Buffington died. Thereupon he rented his house and went to the home of his aunt, Amanda Foster, who had helped to rear him, and there made his home and looked after the affairs of his aged aunt, Amanda. There he remained, making that his home until about August 25, 1909, at which time he was married to one Fannie Davis, after which he returned to and lived in his former home. He lived there with that wife until her death.

It also appears that prior to his marriage to Maggie, William had been married to one Jane _____, and that after her death and before his marriage to Maggie Kye, William Buffington lived with his aunt, Amanda Foster.

Lawrence at his birth was given the name of Lawrence Buffington and in that name he enrolled in school, and was always known by that name. Until he was about 19 years of age he was, for the most part, in the custody of Texanna Bean, his maternal grandmother.

There is no evidence tending to prove that after William Buffington married Fannie Davis, August 25, 1909, he ever received Lawrence into his family with the consent of his wife. In fact, it does not appear that Lawrence was ever in the home of William and Fannie more than one time and that only for a few minutes. But during the time William Buffington lived with his aunt, Amanda Foster, between the date of the death of his wife, Maggie, and his marriage to Fannie, that is, between May 25 and August 25, 1909, Lawrence was frequently brought to the home of William Buffington, and during this period William told a number of people that Lawrence was his son. He bought clothes, etc., for him, gave his grandmother, Texanna Bean, money towards his support, and frequently bought milk and food for him. Sometimes Lawrence would remain in the home of William and his aunt over night. After his marriage to Fannie, William continued to buy clothes, books, etc., for him, and otherwise contributed to his support, and frequently acknowledged him to others as his son. This he continued to do until Lawrence was about 19 years old, at which time Lawrence went to Texas, and on one occasion thereafter there is evidence to show that William Buffington sent Lawrence money through his grandmother to help pay his fare to Oklahoma.

If William Buffington ever received Lawrence into his family within the meaning of section 8057 (1715, O. S. 1931) supra, it must have been during that period between May and August, 1909, when William was single and unmarried.

The question of what is essential to effectuate an adoption under section 8057, supra, where the putative father is a single man, does not appear to have been before this court. No case of that kind arising in this state has been called to our attention.

By the very terms of the section it is apparent that it is not essential that the putative father should have a wife in order to

adopt under said section. It is only essential that he have the consent of his wife, if he has one, to the receiving into his family of such child. All the part the wife, if there be one, plays in such adoption is that she consent that the child be received into the family by the father. It is plain that if there be no wife, no consent is necessary. It has been held in California, under a statute exactly like ours, that it is essential that the father receive the child into his family. In re Jessup's Estate (Cal.) 22 P. 742. Therein it is said:

"If he has a wife, he can only receive it into his family with her consent, but if he has no wife, he must still receive it into his family; that is to say, in such family as he has, the child must be acknowledged and treated as his."

In re De Laveaga's Estate (Cal.) 75 P. 790, it is said:

"The court below seems to have acted upon the theory that where the father of an illegitimate child has no family, the provision of the Code in question in that respect may be dispensed with. This cannot be done. The Legislature, adopting section 230, evidently went as far as public policy would justify in this respect, and the language is too plain to be misunderstood. The father of an illegitimate child, in order to adopt him as legitimate, must not only publicly acknowledge him as his own, but must receive him into his family, and if he have a wife, with her consent. It does not say that he must receive him into his family if he has a family, and, if not, in that case can receive him or send him elsewhere; but having a family, or at least a home in which he can receive him, is one of the cardinal conditions prescribed for such adoption."

It will be observed that in neither of the above cases was it specifically held that in all cases is the existence of a family necessary.

The one says "into such family as he has," intimating that, although there be no family, there might be an adoption under the section. The other says: "But having a family, or at least a home, in which he can receive him is one of the cardinal conditions for such adoption."

In Re Gird's Estate (Cal.) 108 P. 499, it is held that the "existence of a family is essential."

It was there said:

"The words * * * 'receiving it * * * into his family' imply a receiving into a place of which he is the head of which he has control."

And:

"The word 'family' * * * means no more at most than that the father must have a 'home,' a settled place of habitation of which he is the head, into which he must receive the child; such receiving to be with the consent of his wife if he be married." (See Union Trust Co. v. Cox et al., 55 Okla. 68, 155 P. 206, as to definition of "family.")

In that case the father was never married and no person claiming relationship to him ever resided there with him other than the petitioners. They were the children claiming adoption, and it was held, under the facts, that there was sufficient evidence to sustain a judgment declaring an adoption under the section.

In Re Jones' Estate (Cal.) 135 P. 288, it is held:

"Though a father lived in a house on his cattle ranch alone most of the time, but made such house his fixed place of abode and home, he had a family within Civ. Code, sec. 230, providing the father of an illegitimate child, by publicly acknowledging it as his own, receiving it as such into his own family, and otherwise treating it as legitimate, thereby adopts it as such."

And:

"Where an illegitimate child, with its mother's family, went, on the invitation of the father, to the father's home on his cattle ranch, and there remained two months, it was a reception of the child by the father into his family, within Civ. Code, sec. 230."

It will thus be seen that there is authority to sustain the proposition that William Buffington from May 25, to August 25, 1909, had a "family" within the meaning of the word as used in section 8057, supra, into which he could receive Lawrence Buffington as his son. As to whether there is sufficient evidence to sustain the finding of the court that he did so receive him, a much stronger case is made than in the case of Burton v. Noahobi, 144 Okla. 49, 289 P. 335.

The trial court, and counsel for plaintiffs in error, seem to take the view that there is conflict between the holding of this court in Allison et al. v. Bryan, 21 Okla. 557, 97 P. 282, and Burton v. Noahobi, supra.

The trial court asserted but for the holding of the court in the Burton Case, he would follow the rule announced in the Allison Case, supra, and hold there was no adoption.

It is true that there is much said in the Allison Case that would indicate that it is not only necessary that the father of an illegitimate child, in order to adopt or legitimatize in accord with the section under

consideration, should not only receive the child into his family, with the consent of his wife if he be married, but that it there remain. It is therein said:

"By the foregoing authorities it will be observed that the criterion by which compliance with the statute is measured is that the child shall be received into the family of the father and treated as if he were a legitimate child. It is impossible to conceive that it contemplates that child could be legitimated under it and remain elsewhere than in the family of the father."

It must be borne in mind that the question involved in the Allison Case was not whether the child had been received into the family of the father within the meaning of the statute, for that was conceded; the question under consideration was the right to custody of the child as between its father and mother, after it had been adopted by the father in full compliance with the law. The Allison Case itself is not entirely consistent with the statement above quoted. At page 561 of the reported case it is said:

"Numerous methods have been prescribed by the Legislatures of the different states for the adoption or legitimation of illegitimate children, but in each and all of them it will be found the courts have held that, after the child has been legitimated according to the form prescribed by the statute, it is no longer an illegitimate child for any purpose, but that it is immediately endowed with all the attributes of a legitimate child."

In reference to the question of the length of time the child should remain "in the family," it might be pertinent to inquire: When does the child become "immediately endowed with all the attributes of a legitimate child?" Or, in other words, When does the adoption become complete? Is it immediately upon the receipt by the father of the child into the family as a son after publicly acknowledging it as his own, or is it at the end of some period of probation? If so, how long a period? And by what standard is the length of time to be measured? Let us illustrate. A man is married and is the reputed father of an illegitimate child. The mother and the child live at some distance from the home of the reputed father. The reputed father publicly declares that the child is his own, and that on a certain date he will, with the consent of his wife, receive the child into his family as his own, and requests the mother to bring the child to his home on the appointed day. She does so, and there in the presence of numerous neighbors and friends, the father, the wife consenting, openly declares that he does receive the child into the family as his own child, and then and there furnishes the mother with funds sufficient for the immediate needs for the support of the child, and that day or the next the mother departs with her child to her place of abode, and within a few days, without the child having been returned to the home of the father, the father dies. Would it be doubted in any court that the child had been adopted and would be entitled to inherit from the father?

In such case no one would hesitate to say that the statute had been fully complied with; that immediately upon the declaration of the father that he did so receive the child it would be "endowed with all the attributes of a legitimate child."

The question of the right of the respective parents to the care and custody of the child after such adoption is clearly a question apart from that of adoption itself and depends largely upon what is for the best interest of the child, and that was in fact the only question decided in the Allison Case, for there the adoption was a conceded fact.

The only conflict between the Allison Case and the Burton Case is in language used in the Allison Case in discussing a question not there in issue.

On the question of adoption the Burton Case is controlling, and the trial court was right in following it.

There being ample evidence to support the findings and judgment of the trial court, the judgment is affirmed.

CULLISON, V. C. J., and SWINDALL, McNEILL, OSBORN, BUSBY, and WELCH, JJ., concur. ANDREWS, J., dissents. BAYLESS, J., absent.