[Civil No. 4670.   Filed June 19, 1945.]

[159 Pac. (2d) 797.]

In the Matter of the Estate of William Walter Cook, Sometimes Known as W. W. Cook, deceased; LUCILE MacCALLEN and FLORENCE De-WITT, Appellants, v. WILLIAM CHARLES COOK (Whose True Name is Carlos Guillermo Calles), VIRGINIA COOK LOPEZ (Whose True Name is Virginia Lilia Lopez), and JOSE-PHINE LILY COOK, by Her Guardian *Ad Litem* PAUL M. ROCA (Her True Name Being JOSEFA LILIA CALLES), Appellees.

Mr. Leon S. Jacobs; Messrs. Gust, Rosenfeld, Divelbess, Robinette & Coolidge, for Appellants.

Messrs. Moore, Romley & Roca, for Appellees.

UDALL, Superior Judge.—We believe a résumé of the proceedings had in the trial court on this will contest, together with the factual background, will make for clarity in understanding the three simple issues involved on this appeal.

William Walter Cook, better known as Billy Cook, and hereinafter referred to as the decedent or testator, was born in California in the year 1859. He was married prior to coming to Arizona in 1885. His wife died in the year 1923 and he never remarried. A son, their only child, died at the age of fourteen or fifteen years. Shortly after coming to Arizona he formed a partnership with his brother-in-law, and they engaged in the ranching and cattle business and subsequently acquired some 3000 acres of potential farming land in the vicinity of Glendale, Arizona. Upon the dissolution of the partnership he became the owner of the valley ranches, and in their operation and development he became so financially involved that he was frequently in danger of losing all his possessions. When the ranch was sold in 1937 to Dean Stanley for some $92,600 his financial troubles were over. He also owned at various times some city property in Phoenix, which included the family home at 141 East Palm Lane.

The testator first met the two sisters, who are the appellants (hereinafter referred to as they were in the lower court as defendants), in the year 1924. Subsequent to his wife's death he rented his home and boarded and roomed with a Mrs. Lewis (now Kinsey).

From the fall of the year 1927 the testator lived under the same roof as the defendants, first at their residence on Sixth Street, as a roomer and boarder. Later, in 1932, at his insistence they all moved into his old home on East Palm Lane, where they were joined by Miss Elizabeth Arnold. The living expenses were shared by the occupants. During all this period, on numerous occasions, the defendants came to the testator's financial aid by loaning him substantial sums of money, or by endorsing his notes at the bank so that he could borrow from it directly. Doubtless in appreciation for these financial favors, as well as for the care and attention they were bestowing in making a suitable home for him, during his lifetime he conveyed outright to them considerable property, both city lots and farming land, and eventually, by the terms of his will, he purportedly left them his remaining estate.

The testator died suddenly at his home in Phoenix on February 6, 1943. The defendants, who had been named as joint executrices of his will, immediately filed their petition to probate the will. Thereupon the three parties, designated here as the appellees, and in the lower court as contestants or plaintiffs, filed their written contest to the probate of said will. They alleged that they were the "sole surviving children and the sole heirs at law of said decedent . . . and are persons interested in said will and in the estate of said decedent."

Two grounds of contest were specified, viz.: (1) Lack of testamentary capacity; and (2) undue influence by defendants. The answer to the second amended contest denied: (1) Contestants are the children and sole heirs at law of deceased; (2) lack of testamentary capacity of deceased; and (3) undue influence by defendants.

The answer affirmatively alleged: (1) That the plaintiffs were not legitimized or adopted as the chil-

dren of deceased under any law of Arizona; (2) that they lacked legal capacity to contest said will; (3) that the Court was without jurisdiction to entertain the contest for the reasons specified in (1) and (2), *supra;* (4) that the plaintiffs were guilty of laches, in that neither they nor their mother took any action to establish their parentage under the laws of Arizona during the lifetime of the deceased.

A lengthy jury trial followed and at the conclusion of the presentation of evidence and after the parties had rested, the defendants moved the court to instruct a verdict in their favor upon the grounds that the evidence was insufficient to establish (a) that any of the plaintiffs were the children or heirs at law of testator, (b) or to sustain either ground of the contest. Counsel having stipulated that one phase of the controversy should properly be determined by the court, without the aid of the jury, the court thereupon found:

That the plaintiffs William Charles Cook, Virginia Cook Lopez and Josephine Lily Cook were born out of wedlock on November 5, 1918, September 30, 1920, and June 13, 1923, respectively, that their father was the deceased above named and their mother was Faustina Calles, and that plaintiffs William Charles Cook and Virginia Cook Lopez were each adopted extra-judicially by said deceased under the provisions of Section 27–210, Arizona Code 1939.

The Court granted defendants' motion for an instructed verdict on the second ground of contest (undue influence) and denied their motion as to the first ground (testamentary capacity), and submitted to the jury an interrogatory on that issue which the jury, finding that deceased lacked testamentary capacity, answered in the negative. A motion for judgment notwithstanding the verdict was made and denied; and a motion for new trial was subsequently presented, argued and denied. The document was accordingly denied probate and this appeal taken.

The principal part of the testimony had to do with the issue of undue influence but no cross appeal was taken from the court's ruling on that matter.

While there are some fourteen assignments of error, with four legal propositions relied upon to support same, we think that the issues involved are:

Is there substantial evidence in the record to support: (1) The court's finding that deceased was the father of each of the contestants; (2) the court's finding of extra-judicial adoption as to appellees William Charles Cook and Virginia Cook Lopez under the provisions of Section 27–210, *supra;* and (3) the jury's finding of lack of testamentary capacity.

■ In determining whether the evidence sustains the findings of the court and the jury on the matters respectively decided by them, we may only examine the transcript of evidence to ascertain if there is sufficient evidence therein, which, if believed by the court and jury, would sustain the findings or verdict. *Thornburg* v. *Frye,* 44 Ariz. 282, 36 Pac. (2d) 548.

■ The three contestants—whom we shall refer to as William, Virginia and Josephine—were admittedly born out of wedlock in 1918, 1920, and 1923, respectively. Their mother was Faustina Calles and we think there is ample evidence in the record to sustain the finding of the trial court that Billy Cook was the father of all three contestants. Each of the children testified that the testator had acknowledged to them that he was their father; and there is evidence that a similar acknowledgment was made to one Laurable Gardiner, an old acquaintance, and to one J. Arthur Miller, who was then a juvenile probation officer of Maricopa County. When William registered in the Phoenix Union High School in 1932 as Charles William Cook the testator signed the registration card as his father. He unquestionably aided their mother and the children financially over a period of years and frequently visited them at the places where they were

living. True, there is other evidence that discredits and conflicts with this significant testimony. The trial court evidently believed the contestants on this score and we can not say he was in error in so doing.

William and Virgina were born prior to, and Josephine after, the effective date of Section 27–401 (unless otherwise stated all Code citations refer to Arizona Code Annotated, 1939) (Laws 1921, Ch. 114, Sec. 1), which declares every child to be the legitimate child of its natural parents and gives it the right of inheritance. In view of our decision in *In re Silva's Estate*, 32 Ariz. 573, 261 Pac. 40, holding that this section applies only to children born out of wedlock after the effective date of the act, plaintiffs William and Virginia are not entitled to inherit unless they were adopted extra-judicially by deceased as provided by Section 27–210 which was enacted long prior to the birth of any of the plaintiffs.

Our statute on extra-judicial adoption (Sec. 27–210) is identical with the Oklahoma statute and with Sec. 230, Civil Code of California. In California it has been held that four things are essential under this section for the adoption of an illegitimate child by its father: (1) He shall be its natural father; (2) He shall have publicly acknowledged himself to be the father; (3) He shall have received the child into his family; (4) He shall have otherwise treated it as his legitimate child. 1 Cal. Jur. Sec. 35, page 455.

In order to complete legitimation under this section *all of its provisions must be complied with*. *In re Baird's Estate*, 193 Cal. 225, 223 Pac. 974; *In re Estate of De Laveaga*, 142 Cal. 158, 75 Pac. 790; *Thompson* v. *Thompson*, 177 Okl. 437, 60 Pac. (2d) 615.

The contestants William and Virginia met requirements (1) and (2), *supra*, but in our opinion failed to meet those prescribed under (3) and (4). Briefly the facts relied upon by the contestants to substantiate these requirements, other than those already

recited, are that the children and their mother *visited* deceased at the various places where he lived. That he brought the children Christmas gifts, purchased their groceries at Wing Ong Grocery Store; sent "alimony" checks monthly; that he called on them after they were married and kissed Virginia and her baby, and that he helped the latter's husband get a job. That he manifested interest in their welfare and future.

The record does indubitably show that the contestants lived with their mother until her death and thereafter had their place of residence separate and apart from the testator, and that testator at all times had his place of residence separate and apart from theirs. Each home was free from occupancy by the other. The contestants only claim to have "Visited" his home, not to have lived there. This does not constitute "receiving them into his family" as the law so definitely requires. At least, the two older children were born long before his wife died, but there is no evidence that she ever knew of their existence.

Neither does the record bear out a finding that the testator treated them as his legitimate children. When money was given to them by check the surname used was "Calles" not "Cook." So with the Studebaker car given to William he positively refused to change the endorsement which he had made to "Billy Calles" to permit the use of his surname. He told the Deputy County Attorney that he was not related to the boy, "no more related to him than I am to you." What is most significant, ten of the decedent's closest friends testified that they had never seen or heard of contestants. No father would treat a legitimate child in this manner.

The case chiefly relied upon by contestants, *In re Buffington's Estate,* 169 Okl. 487, 38 Pac. (2d) 22, is readily distinguishable on the facts. There the father openly admitted parentage of the child before its birth and often thereafter for nearly twenty years publicly

acknowledged the boy as his own and treated him as a legitimate son. For a brief period of a few months in infancy the boy was brought to his home and lived under his roof. The Court held this was sufficient "reception of the child into his family" though he never again lived under the parental roof.

A careful scrutiny of the entire record fails to disclose any substantial evidence, even if believed by the court, to establish that either of these children had ever been received into the family of Billy Cook, within the legal meaning of that term, or that he ever treated them as one would a legitimate child. The Court erred in not holding that the two older children lacked legal capacity to contest said will.

Since Josephine was born after 1921, such extra-judicial adoption is not necessary insofar as she is concerned. She is for all purposes the legitimate child of her father, with full right of inheritance. Sec. 27–401. Hence she may maintain this contest unless she is estopped therefrom by reason of laches. Such a plea was urged in the trial court and is made one of the grounds on appeal.

The defendants urge: (1) that because of the failure of the mother to institute a civil action within one year after the birth of the child to establish her parentage under the provisions of Sec. 27–402 laches should be charged to the minor; (2) that by reason of the Legislature in 1931 (Chap. 22, now Sec. 27–403 and 27–404) making the minor at age sixteen years *sui juris,* to initiate proceedings to establish her identity or fix her own birthright and parentage, failure of Josephine to avail herself of this provision should deny her the right to be heard in this proceeding. There is no merit to either contention.

Judge Ross, speaking for this Court in the case of *In re Silva's Estate,* 32 Ariz. 573, 579, 261 Pac. 40, 42, made it clear that this procedure was not exclusive, and that the primary purpose of the legisla-

tion was to fix the father's obligation to support and educate the child. He said it was directed to the protection of infants and not grown ups. Such proceedings it seems to us, are in the nature of actions for declaratory judgments.

Probate courts have always had jurisdiction to determine who are the persons entitled to share in the distribution of the estate of a person dying intestate— and, as a corollary, who are the children of the deceased. It would be unwarranted to hold that the beneficent provisions of Sec. 27-401 could be nullified by reason of the failure of either the mother or the child to timely establish parenthood and thereby bastardize the child whom the legislature had declared to be legitimate with the right of inheritance as though born in wedlock.

The final issue presented is whether there is substantial evidence in the record to support the jury's finding of lack of testamentary capacity.

The will in question was executed August 30, 1939, being some three and one-half years prior to the testator's death. The *animus testandi* is proven by the testimony of the subscribing witnesses, Custin and Barkley, the latter being the attorney who drew the will.

Seventeen disinterested witnesses, comprising outstanding men and women of the business, professional and fraternal life of Phoenix, testified that decedent left his estate to the persons whom he thought were entitled to receive it. They, with ten other reputable citizens, which included two doctors, one of whom was the family physician, testified that Billy Cook was of sound mind and possessed testamentary capacity. Dr. Louis Baldwin neatly expressed what all of them in effect testified to, when he said: "I thought mentally he seemed to be entirely normal and a shrewd old gentleman."

■ The burden of proof on this issue was upon the plaintiffs, yet not a single witness took the witness stand and testified that the testator was of unsound mind or lacked testamentary capacity. What then do the contestants rely upon to support the judgment? First: The death certificate which shows that deceased was 84 years of age when he died and that the immediate cause of death was a coronary occlusion of a few minutes' duration due to arteriosclerosis of a duration of years. Second: The testimony of Dr. O. C. West, who was not acquainted with decedent, but in response to a hypothetical question testified that the disease arteriosclerosis tends to produce faulty concentration and memory defects, especially as to recent events. On cross examination he admitted that he could not form any individual opinion as to the mental capacity or incapacity of decedent. Third: That Alma Grace Sears, a defense witness, testified that "Cook told her he had no living relatives that he knew of"; this, coupled with the intrinsic evidence in the Fifth clause of the will itself, which reads in part:

"*I have no known issue,* but should any one or more claim, . . . to be my issue; then I hereby bequeath to each of such claimants the sum of Ten Dollars and no more. . . . Such claimant must first establish by . . . judgment of a court . . . that such claimant is my issue."

This evidence, the contestants contend, supports the judgment and warranted the court in submitting the issue of decedent's testamentary capacity to the jury. They claim this is most convincing evidence tending to prove that testator did not have a knowledge of the natural objects of his bounty, nor a recollection of the persons related to him by ties of blood and affection, or a recollection of the nature of the claims of those excluded from sharing in his estate. In other words, they contend that he was laboring under an "insane delusion" and thereby lacked testamentary capacity.

On the paternity issue, however, the contestants stoutly avowed that the testator recognized them and treated them as his children up to the day of his death. They should be consistent, they can not blow both hot and cold.

An insane delusion has been defined to be "the conception of a disordered mind which imagines facts to exist of which there is no evidence and the belief in which is adhered to against all evidence and argument to the contrary, and which cannot be accounted for on any reasonable hypothesis." *In re Putnam's Estate*, 1 Cal. (2d) 162, 34 Pac. (2d) 148, 153.

Cogent reasons suggest themselves why the testator inserted this particular clause of "no known issue" in the will. He may well have considered that the handicap imposed to establish heirship, coupled with the small bequest if they prevailed, would deter the children from bringing to light this unsavory page in his past life. If this assumption be correct, or any other reasonable hypothesis can account for it, it would not constitute an insane delusion, but rather a cagey way of handling a delicate situation. See *Smith* v. *Smith*, 48 N. J. Eq. 566, 25 Atl. 11.

Furthermore, the statement in *Re Nolan's Estate*, 25 Cal. App. (2d) 738, 78 Pac. (2d) 456, 458, is apposite:

"When mental incapacity is the ground of attack, the dispositary clauses of the will are not, in and of themselves, evidence of mental incapacity which would overcome the presumption of sanity and competence."

There is no testimony that Billy Cook was mentally incapacitated or laboring under an insane delusion *at the time of the execution of the will,* and that is the material point of time in this inquiry. *In re Estate of Greene*, 40 Ariz. 274, 278, 11 Pac. (2d) 947.

From a careful examination of the entire transcript of evidence we are of the opinion that there is not sufficient evidence to sustain the jury's verdict

or the Court's judgment holding such a lack of testamentary capacity as to invalidate the will then made by him. The evidence is overwhelming to the effect that he was mentally competent in every respect. Without doubt the will expressed his mature wishes with reference to the final disposition of his property. Under these circumstances it is our duty to uphold the will and protect him in the right which the law gives him. It was his privilege to disinherit these children if he desired to do so. The principles of law governing the matters here raised are well stated in the cases of: In re Estate of Greene, *supra,* and *In re Estate of Smith,* 53 Ariz. 505, 91 Pac. (2d) 254. It is unnecessary to restate them.

It was error for the trial court to deny defendants' motion for an instructed verdict on the issue of testamentary capacity.

The judgment of the lower Court is reversed and the cause remanded with instructions to enter judgment admitting the will to probate.

STANFORD, C. J., and MORGAN, J., concur.

LaPRADE, J., having disqualified, the Honorable LEVI S. UDALL, Judge of the Superior Court of Apache County, was called to sit in his stead.