In re GATHINGS' ESTATE.
GATHINGS et al. v. MILLER.

No. 32575.   Nov. 25, 1947.

*187 P. 2d 981.*

Paul D. Busby, of Lawton, for plaintiffs in error.

Thomas & Thomas, of Lawton, for defendant in error.

GIBSON, J.   This matter arose in the county court of Comanche county in the administration of the estate of P. S. Gathings, deceased.   Gathings engaged in the practice of medicine at Lawton for about 30 years.   He died in March, 1944, and shortly thereafter administration proceedings were commenced.   In December, 1944, Willie Miller, as guardian ad litem of Valoria McDaniel, filed an instrument entitled "Claim of Heir" wherein it was claimed that Valoria McDaniel was the sole and only heir of Gathings and entitled to all of the property belonging to his estate. The county court rendered judgment holding that Valoria McDaniel was the child of P. S. Gathings, that he had adopted her during his lifetime, and decreeing her to be the sole and only heir of said deceased and ordering distribution of his entire estate to her. The district court on appeal rendered judgment in favor of Valoria McDaniel affirming the judgment of the county court and remanding the cause to the county court with instructions to distribute the estate in accordance with the judgment.   From the latter judgment plaintiffs in error have appealed to this court.   The parties will generally be referred to as appellants and appellees.   The only issues involved in the trial of the case below were that of parentage by P. S. Gathings of Valoria McDaniel and legitimation.   There is ample evidence to sustain the finding of the trial court that Gathings was the father of Valoria McDaniel.   We are called upon to determine whether or not Valoria was legitimatized under the provisions of 10 O. S. 1941 §55, which reads as follows:

"The father of an illegitimate child by publicly acknowledging it as his own, receiving it as such, with the consent of his wife, if he is married, into his family, and otherwise treating it as if it were a legitimate child, thereby adopts it as such, and such child is thereupon deemed for all purposes legitimate from the time of its birth.   The status thus created is that of a child adopted by regular procedure of court."

The evidence establishes that Earcel Price, the mother of Valoria, became

intimately acquainted with Gathings while she was a student in high school. Earcel became pregnant in 1932. When her mother, Edna Price, learned of her condition, she had a talk with Gathings and he admitted being the father of the child and promised to take care of Earcel and the child. Earcel was living with her mother when the child was born in March, 1933. Earcel's grandmother, Samantha McDaniel, a practical nurse, delivered the baby. Dr. Gathings was notified on the morning following the birth of the child and he promptly came to see it. Two or three days after the baby was born Dr. Gathings made arrangements with Samantha McDaniel to take the baby to Austin, Tex., where Samantha maintained her home. He paid the expenses of the trip and for the support of Samantha and the baby. Two or three months later the baby took sick and Dr. Gathings sent Tom Tapscott and his brother who, it appears, were taxi drivers, to Austin, Tex., to bring Samantha and the baby back to Lawton. When this party arrived in Lawton they went to the doctor's office and he examined the baby, and thereafter Samantha and the baby were taken to the home of Edna Price. Earcel graduated from high school in 1933. The following year she went to Langston University where she remained until she graduated in 1937. All of her expenses were paid by Dr. Gathings. She thereafter took a job teaching at Grandfield, Okla., where she remained for three years. She later moved to San Antonio and thence to Austin, Tex., where she has taught school for the past four years. Samantha McDaniel has had exclusive care and custody of Valoria since the time of her birth. She kept the child at Lawton, residing in the home of her daughter, Edna, for a period of four years. Dr. Gathings set her up in business with a small grocery store, the proceeds from which she used to support herself and the child. Earcel would come home from Langston sometimes on the week-ends and would take the child to visit Dr. Gathings. She testified that she would go to see the doctor about 8 o'clock in the evening and would stay until 10 or 11 o'clock at night and they would plan about the child's future. Dr. Gathings wanted the child to be a doctor and he promised her that he would see that she was educated. Samantha testified that she and her daughter, Edna Price, would take the baby down to see the doctor "sometimes". Edna Price testified that she took the baby to the doctor's home "lots of times". Dr. Gathings lived by himself, his office and home being in the same building. The mother, grandmother, and great-grandmother of the child testified that Dr. Gathings frequently came to their home to visit them and the child. All of the foregoing facts were established by testimony of the mother, grandmother and great-grandmother. This evidence was corroborated in some particulars by disinterested witnesses who testified substantially as follows: Four colored ministers, Reverends Calwell, Tieuel, Edwards and Burton, testified that Dr. Gathings had admitted to them separately and in the privacy of his office that he was the father of Valoria; that he had educated her mother, Earcel, and that he intended to see that the child received a good education. Tom Tapscott testified that he drove a car for Dr. Gathings; that he and his brother, who is now in California, drove to Austin, Tex., and brought the old lady (Samantha) and the baby back to Lawton, and they stopped at the doctor's office for about 30 minutes. Also, that he drove Dr. Gathings to the Prices' home "a lot of times". Samantha took the child to Austin, Tex., to live about 1938, and Dr. Gathings did not see her again after that date.

The foregoing is substantially the evidence established by appellee at the trial.

The appellants produced ten witnesses, many who claimed to be intimate friends of Dr. Gathings, and fellow

462

lodge members, who testified in substance that they had never heard of the child, Valoria, until after the doctor's death. Ophelia Rhodes, who lived near the doctor's home and "watched his office" for him when he was away, had never seen or heard of Valoria prior to the doctor's death. Anthony Smith, who took the doctor's meal to him every day at about 6 p.m., had never heard of Valoria until after the doctor's death and he did not recall ever seeing her in the doctor's office or home. The surviving brother, Eli Gathings, and the rest of the appellants were nonresidents of Oklahoma. Dr. Gathings wrote Eli once or twice a year. He had never mentioned Valoria or that he had a child in any of his letters. Dr. Gathings' age was not established to any reasonable degree of certainty. His age at the date of death was variously given by witnesses on both sides as ranging from 60 to 84 years.

It is contended that there is insufficient evidence of (a) public acknowledgment, (b) reception into the home, and (c) treatment of the child as legitimate, to sustain the court's finding that P. S. Gathings had adopted the child within the meaning and intent of the statute.

In view of our holding in Jones et al. v. Snyder, Guardian, 121 Okla. 254, 249 P. 313, that the public acknowledgment prescribed by the statute may be proven by acts and conduct independently of a public proclamation, we think there is ample evidence to sustain the finding of the court in such respect.

The question of reception into the family and treatment as legitimate are so interrelated they will be considered together. In support of each contention emphasis is placed upon the one fact that, although the doctor had a home the child did not at any time live therein, which is deemed inconsistent with being received into the family and unnatural if the child had been a legitimate child.

Reliance is placed upon In re Jessup's Estate, 81 Cal. 408, 22 P. 742, 749, wherein it is said:

"If he has a wife, he can only receive it into the family with her consent, but if he has no wife he must still receive it into his family; that is to say, in such family as he has the child must be acknowledged and treated as his."

In re DeLaveaga's Estate, 142 Cal. 158, 75 P. 790, 794, is also relied on. Therein, referring to the same section, it is declared:

"It does not say that he must receive him into his family if he has a family, and, if not, in that case can receive him or send him elsewhere; but having a family, or at least a home in which he can receive him, is one of the cardinal conditions prescribed for such adoption."

And there is reliance also upon the following which is quoted from Allison et al. v. Bryan, 21 Okla. 557, 565, 97 P. 282:

"By the foregoing authorities it will be observed that the criterion by which compliance with the statute is measured is that the child shall be received into the family of the father and treated as if he were a legitimate child. It is impossible to conceive that it contemplates that a child could be legitimated under it and remain elsewhere than in the family of the father."

The doctrine of these cases and others were considered by this court in Re Buffington's Estate, 169 Okla. 487, 38 P. 2d 22, where the child who was recognized by the putative father, though visiting, did not reside in the latter's home and was provided for elsewhere. We said:

"In reference to the question of the length of time the child should remain 'in the family,' it might be pertinent to inquire: When does the child become 'immediately endowed with all the attributes of a legitimate child?' Or, in other words, When does the adoption become complete? Is it immediately upon the receipt by the father of the

child into the family as a son after publicly acknowledging it as his own, or is it at the end of some period of probation? If so, how long a period? And by what standard is the length of time to be measured? Let us illustrate. A man is married and is the reputed father of an illegitimate child. The mother and the child live at some distance from the home of the reputed father. The reputed father publicly declares that the child is his own, and that on a certain date he will, with the consent of his wife, receive the child into his family as his own, and requests the mother to bring the child to his home on the appointed day. She does so, and there, in the presence of numerous neighbors and friends, the father, the wife consenting, openly declares that he does receive the child into the family as his own child, and then and there furnishes the mother with funds sufficient for the immediate needs for the support of the child, and that day or the next the mother departs with her child to her place of abode, and within a few days, without the child having been returned to the home of the father, the father dies. Would it be doubted in any court that the child had been adopted and would be entitled to inherit from the father?

"In such case no one would hesitate to say that the statute had been fully complied with; . . . that immediately upon the declaration of the father that he did so receive the child it would be 'endowed with all the attributes of a legitimate child.'

"The question of the right of the respective parents to the care and custody of the child after such adoption is clearly a question apart from that of adoption itself and depends largely upon what is for the best interest of the child, and that was in fact the only question decided in the Allison Case, for there the adoption was a conceded fact."

The status which in contemplation of law bespeaks a family is referable more to the relationship that obtains between the parties thereto than their congregation at a given place. In Putnam v. Southern Pac. Co., 21 Ore. 230, 27 P. 1033, 1037, there is declared:

"While the word 'family' usually imports a household, including parents, children, and servants, it is not always necessary, to sustain the family relation between parents and children, that they should have a residence together. It is the assumption of the duties that belong to the relation of parent and child that determines such family relation as existing in fact, and fixes their social status after maturity."

In Rolator v. King, 13 Okla. 37, 73 P. 291, we said:

"In Roco v. Green, 50 Tex. 483, the court laid down the following general rules to determine when the relation of a family, as contemplated by law, exists: First, it is one of social status, not of mere contract; second, legal or moral obligation on the head to support the other members; third, corresponding state of dependence on the part of the other members for their support."

Concerning construction of the statute the court, in Re Jessup's Estate (Cal.) 21 P. 976, 979, declared:

"If the paternity of the child be the matter in dispute, strict proof of the fact should be required, but once the paternity is established the statute should be liberally construed, so far as it affects the question of legitimizing the child. We may fairly assume that such was the legislative intent."

If in the instant case the doctor had had a home which reflected a family circle to which recourse could properly be had to ascertain the members thereof, the importance of the reception and the maintenance of the child therein upon which stress is laid would be manifest. Such, however, not being the case, they are not controlling considerations.

We consider the evidence sufficient to sustain the holding of the trial court, and the judgment is affirmed.

HURST, C. J., and RILEY, CORN, ARNOLD, and LUTTRELL, JJ., concur. BAYLESS, J., dissents.