563 F.2d 543
 Chin LAU, Plaintiff-Appellee-Cross-Appellant,
v.
Maurice F. KILEY, District Director of the New York
District, Immigration and Naturalization Service,
United States Department of Justice,
Defendant-Appellant-Cross-Appellee.
 Nos. 1081, 1301, Dockets 76-6114, 76-6119.
 United States Court of Appeals,
Second Circuit.
 Argued May 4, 1977.
Decided Oct. 3, 1977.
 
 Benjamin Gim, New York City (Edward J. Ennis, New York City, of counsel), for plaintiff-appellee-cross-appellant.
 Thomas H. Belote, Asst. U. S. Atty., New York City (Robert B. Fiske, Jr., U. S. Atty., S.D.N.Y., Robert S. Groban, Jr., Sp. Asst. U. S. Atty., New York City, of counsel), for defendant-appellant-cross-appellee.
 Before WATERMAN and GURFEIN, Circuit Judges, and BLUMENFELD,* District Judge.
 WATERMAN, Circuit Judge:
 
 
 1
 Is a child born to unmarried parents in the People's Republic of China a "legitimate" child? That is the single question presented by this very well briefed and argued appeal. A relevant Chinese statute provides:
 
 
 2
 Children born out of wedlock shall enjoy the same rights as children born in lawful wedlock. No person shall be allowed to harm them or discriminate against them.
 
 
 3
 Where the paternity of a child born out of wedlock is legally established by the mother of the child or by other witnesses or by other material evidence, the identified father must bear the whole or part of the cost of maintenance and education of the child until the age of eighteen.
 
 
 4
 Marriage Law of the People's Republic of China, Article 15. Construction of this statute, necessary in deciding the issue before us, is not surprisingly a question of first impression in our court, but it is nonetheless one whose resolution will not be without impact on the application of our immigration laws.
 
 
 5
 This case was brought by Chin Lau, a Chinese citizen and an alien permanently resident in the United States, who seeks to obtain a visa preference for one Kin Kok Lau, whom Chin Lau asserts is his son by a woman Chin never married. The defendant is Maurice Kiley, sued in his official capacity as New York District Director of the Immigration and Naturalization Service ("INS"). To aid in understanding the facts, we first describe the statutory context within which visa preferences are made available.
 
 
 6
 Under the Immigration and Nationality Act, 8 U.S.C. § 1101 et seq. (1970), immigration into the United States from the Eastern Hemisphere is restricted to a total allowance of 170,000 visas per fiscal year[1] with a 20,000 limit per country.[2] Operating within the hemispheric limitation is a seven-tier preference system, primarily designed to further the basic objective of reuniting families and also to attract to this country aliens with needed skills. S.R. No. 748, 89th Cong., 1st Sess. 13, reprinted in (1965) U.S.Code Cong. & Admin.News 3328, 3332. Under the preference system, which is set forth in section 203(a) of the Act, 8 U.S.C. § 1153(a), and so far as relevant here, the first twenty percent of the visas are made available to qualified immigrants who are the unmarried sons or daughters of United States citizens (the "first preference" class), and the next twenty percent to the spouses, unmarried sons or unmarried daughters of aliens lawfully admitted for permanent residence (the "second preference" class).[3] While neither of the terms "sons" or "daughters" is defined in the Act, it seems well established that in order to qualify as a "son" or "daughter" for the purpose of obtaining visa preference, one must once have qualified as a "child" under section 101(b)(1) of the Act, 8 U.S.C. § 1101(b)(1). Matter of Coker, Interim Decision No. 2255 (B.I.A.1974). Section 101(b)(1), in relevant part, defines "child" as:
 
 
 7
 an unmarried person under twenty-one years of age who is
 
 
 8
 (A) a legitimate child; or
 
 
 9
 (C) a child legitimated under the law of the child's residence or domicile, or under the law of the father's residence or domicile, whether in or outside the United States, if such legitimation takes place before the child reaches the age of eighteen years and the child is in the legal custody of the legitimating parent or parents at the time of such legitimation(.)[4]
 
 
 10
 Determination of a child's legitimacy is governed by the law applicable at the time and place of his birth. Matter of Kwan, 13 I. & N. Dec. 302, 305 (B.I.A.1969).
 
 
 11
 To obtain a preference, a citizen of the United States or an alien lawfully admitted for permanent residence who claims that the alien seeking the preference is entitled to preference status by reason of the relationship described in section 203(a) files a petition for such classification with the Attorney General.[5] The alien seeking the preference is the "beneficiary"; the citizen or permanent resident alien filing on his behalf is the "petitioner."
 
 
 12
 Having set the stage, we turn to the facts of the present appeal as petitioner alleges them to be.
 
 
 13
 * Chin Lau ("Lau"), a native of China and citizen of the People's Republic of China ("PRC"), is an alien lawfully admitted to the United States in 1966 for permanent residence here and now residing in New York City. In 1947, while living in Canton, Lau began cohabiting with a woman named Chin Dung You, whom he never married. In 1948, a daughter was born to the couple, and, on June 16, 1952, a son, Kin Kok Lau, was born. Lau has always acknowledged his paternity of these children. Until 1958, when he escaped from Communist China to Hong Kong, Lau lived with them and supported and maintained them, together with his mother, in his home in Canton. From 1958 to 1966, while he lived in Hong Kong, Lau sent money to his mother for the support of his son and daughter.
 
 
 14
 In 1966, after obtaining a visa preference through his father who was an alien lawfully admitted for permanent residence in the United States, Lau obtained an immigrant visa and was admitted to the United States as a permanent resident alien. While in the United States, he has continued to support his children in China. In 1973, Lau married a woman in New York; this is his first and only marriage.
 
 
 15
 On September 13, 1973, Lau filed a visa petition on behalf of his son, Kin Kok Lau, seeking to obtain preference status for Kin Kok Lau pursuant to section 203(a)(2) of the Immigration & Nationality Act, 8 U.S.C. § 1153(a)(2), which gives spouses and unmarried children of aliens lawfully admitted for permanent residence "second preference" in obtaining immigrant visas. Upon obtaining an immigrant visa, Kin Kok Lau could procure an exit visa from the People's Republic of China and emigrate to this country.
 
 
 16
 In support of his petition, Lau submitted affidavits from himself, his first cousin, and a woman from a neighboring village in China, all of which stated, on the basis of personal knowledge, that Lau was the father of Kin Kok Lau and that Kin Kok was known throughout Lau's village as Lau's son. He also offered other secondary evidence, including a photograph taken in China in 1954, of himself, Chin Dung You, and their two children, as well as letters from Kin Kok Lau thanking Lau for sending money for his support.
 
 
 17
 The INS denied Lau's petition on February 28, 1974. The District Director held that, under section 101(b)(1) of the Act, 8 U.S.C. § 1101(b)(1), only a legitimate or legitimated child could claim an immigration status through his father, and since "the beneficiary was illegitimate at birth and * * * no evidence has been presented to establish that the beneficiary has been legitimated(,)" the petition was denied.[6] No determination was made as to whether Kin Kok was indeed Lau's natural child.
 
 
 18
 On October 23, 1974, the Board of Immigration Appeals affirmed the decision of the District Director and dismissed the appeal. The Board observed that to qualify as a "son" for the purpose of obtaining a visa preference, one must have once qualified as a "child" under section 101(b)(1) of the Act that is, insofar as relevant here a "son" must be (1) a legitimate child, or (2) a child legitimated under the law of the child's residence or domicile, or under the law of the father's residence or domicile if legitimation takes place before the child is eighteen and while the child is in the legal custody of the legitimating parent. Rejecting Lau's arguments that under the law of the People's Republic of China there is no distinction between children born in wedlock and children born out of wedlock, the Board, following an earlier decision, Matter of Lo, 14 I. & N. Dec. 379 (B.I.A.1973), held that since Lau had not shown that he had " 'legally established' " his paternity, his son was not his "legitimate child" and, therefore, could not qualify for preference status under the Act as Lau's son. The Board made no finding as to whether Lau was in fact Kin Kok's natural father.
 
 
 19
 On March 13, 1975, Lau commenced this action in the United States District Court for the Southern District of New York seeking a declaratory judgment that the Board erred as a matter of law in holding that Kin Kok was not legitimated within the meaning of section 101(b)(1)(C); that section 101(b)(1)(D) of the Act, which extends certain preference privileges only to an illegitimate child beneficiary where the mother is the petitioner, is unconstitutional;[7] and that
 
 
 20
 refusal of the (District Director) and Board of Immigration Appeals to consider plaintiff's uncontroverted evidence of his paternal relationship to his son, Kim (sic) Kok Lau, and make a determination of fact of the claimed relationship constituted a denial of due process of law and the unconstitutional assertion of a conclusive irrebuttable presumption against plaintiff that Kim (sic) Kok Lau is not his son and that (District Director) be directed to consider the evidence and make a factual determination thereon.[8]
 
 
 21
 With most of the facts stipulated, and none of them controverted, the Director moved, and Lau cross-moved, for summary judgment, pursuant to Rule 56, Fed.R.Civ.P. Lau contended that under the law of the People's Republic of China all children and therefore his son Kin Kok are "legitimate," while the Board maintained that some form of paternity proceeding is required to determine the legitimacy of a child born out of wedlock.
 
 
 22
 The District Court, while holding that the Board erred in concluding that a paternity suit is required to determine legitimacy, rejected Lau's argument that all children born in the People's Republic of China are legitimate. Concluding that "the terms 'legitimate child' and 'illegitimate child' are meaningless in the context of the Chinese legal system," 410 F.Supp. 221, 224 (S.D.N.Y.1976), the court focused on the foremost policy underlying the granting of preference visas under our immigration laws, that of the reunification of families and there stated:
 
 
 23
 It is, therefore, obvious that preferences are not to be granted unless it is shown that a family relationship existed. Normally this is done by showing that the beneficiary is a legitimate or legitimated child. However, in the present context, where those terms are meaningless, it is disingenuous to insist on such a showing. Rather, it is sufficient if a petitioner is able to prove the existence of the requisite family relationship as a matter of fact.
 
 
 24
 Id. Observing that if Lau could meet the standard of proof required by the INS and prove, to the satisfaction of the INS, that he is Kin Kok's natural father and that they treated each other as father and son, "then there is no valid reason why the desired preference should be denied," 410 F.Supp. at 225, the court remanded the case to the Board of Immigration Appeals for reconsideration of Lau's visa petition in accordance with the court's opinion. Judgment denying the Director's motion for summary judgment and granting Lau's cross-motion to the extent of remanding to the Board for reconsideration was entered on May 24, 1976.
 
 
 25
 This appeal followed.[9] The Director contends that the District Court erred in holding that, under Article 15 of the Marriage Law of the People's Republic of China, the legally establishing of paternity is not required to establish the legitimacy of a child born out of wedlock. Further, he argues that even if it could be shown that Lau is Kin Kok's natural father, this would still not render Kin Kok eligible for a preference, because Lau had failed to produce evidence either that legitimation had taken place under Chinese law or that Chinese law made no provision for "legitimating" a child; thus, the Director argues, the District Court also erred in ordering a remand to the Board for fact-finding. "Section 101(b)(1)(C) clearly requires an act of legitimation under the applicable law, not just a factual determination that the relationship of father and son exists." (Brief for appellant Director, at 27.) Finally, the Director argues that unless there was an act of legitimation, either in China (under the law of the child's residence or domicile) or in New York (under the law of the father's residence or domicile), the fact-finding process to determine paternity ordered by the District Court is irrelevant and would abrogate the statutory requirement that the child have been legitimated by some procedure.
 
 
 26
 We have examined Article 15 of the Marriage Law of the People's Republic of China, and we are convinced that all children born in the PRC are legitimate at birth, in the only sense of the term "legitimate" that is meaningful in the Chinese context. We therefore hold that, under the law of the People's Republic of China, if Kin Kok Lau shall be proven to be the natural son of Chin Lau, Kin Kok Lau is the "child" of Chin Lau under section 101(b)(1) of the Immigration & Nationality Act.
 
 II
 
 27
 Legitimacy is a legal concept. The law makes a child legitimate or illegitimate. The law determines whether and under what circumstances a child it has denominated illegitimate may become legitimate. Indeed the term "illegitimate" means "(t)hat which is contrary to law(.)" Black's Law Dictionary (4th ed. 1957). There must be some purpose in the distinction the law makes between legitimate children and illegitimate children. The distinction must have some effect and must have been designed to distinguish between the two categories in order that they have different rights or obligations. Whether a child is born in wedlock or out of wedlock may be sociologically, religiously, or psychologically significant, but there is no legal significance unless the law makes one.
 
 
 28
 A very brief look at how our legal tradition has dealt with "this painful but interesting subject," 4 Kent, Commentaries on American Law *415, will help elucidate the issue before us.
 
 
 29
 Under English law, it appears that as early as the time of Edward II a bastard was a filius nullius, the child of nobody, 3 Holdsworth, A History of English Law 498 n.4 (3d ed. 1923), or filius populi, a child of the people, 1 Blackstone, Commentaries on the Laws of England *459, although the only (albeit serious) legal consequence seems to have been that he could not inherit from his parents or from anyone else. 2 Pollock & Maitland, The History of English Law 396-97 (2d ed. 1898). In the church he could obtain neither office nor honor. Id.
 
 
 30
 Still, the distinction between the legal concept of legitimacy and the biological or natural condition of filiation has long been recognized. Blackstone observed that
 
 
 31
 the duty of parents to their bastard children, by our law * * * is principally that of maintenance. For, though bastards are not looked upon as children to any civil purposes, yet the ties of nature, of which maintenance is one, are not so easily dissolved(.)1 Blackstone, Commentaries on the Laws of England * 458. Blackstone himself favored the more lenient bastardy laws:
 
 
 32
 And really any other distinction, but that of not inheriting, which civil policy renders necessary, would, with regard to the innocent offspring of his parents' crimes, be odious, unjust, and cruel to the last degree(.)
 
 
 33
 Id. at * 459.
 
 
 34
 In our own country also, the "unhappy fruits of illicit connection," 2 Kent, supra, at *208, were subjected to various more or less severe restrictions on their ability to inherit.
 
 
 35
 A bastard being, in the eye of the law, nullius filius, or, as the civil law, from the difficulty of ascertaining the father equally concluded, patrem habere non intelliguntur, he has no inheritable blood, and is incapable of inheriting as heir, either to his putative father, or his mother, or to any one else, nor can he have heirs but of his own body. This rule of the common law, so far at least as it excludes him from inheriting as heir to his mother, is supposed to be founded partly in policy, to discourage illicit commerce between the sexes.
 
 
 36
 Id. at * 212.
 
 
 37
 Gradually, in many of the states, an "illegitimate" child came to have more of the rights of a "legitimate" child, especially with regard to inheriting from and transmitting inheritance to the mother. See e. g. Stevenson's Heirs v. Sullivant, 18 U.S. (5 Wheat.) 207, 5 L.Ed. 70 (1820). As Chancellor Kent put it:
 
 
 38
 This relaxation in the (inheritance) laws of so many of the states, of the severity of the common law, rests upon the principle that the relation of parent and child, which exists in this unhappy case in all its native and binding force, ought to produce the ordinary legal consequences of that consanguinity.
 
 
 39
 2 Kent, supra, at * 213.
 
 
 40
 Changes in these laws were brought about also when the legislators "looked at the unoffending character of the children, rather than at the criminal conduct of the parents, of whom they were the offspring." Lessee of Brewer v. Blougher, 39 U.S. (14 Pet.) 178, 199, 10 L.Ed. 408 (1840).
 
 
 41
 In most states, even today, the child born out of wedlock is placed in a position legally inferior to the child born to married parents. As one authority has observed,
 
 
 42
 (t)he origin of the distinction between legitimate and illegitimate children is perhaps not so remarkable, in view of Christian doctrines of marriage, as is the tenacity with which the distinction has persisted in our law and custom.
 
 
 43
 Clark, Law of Domestic Relations 155 (1968).
 
 
 44
 Because legitimacy, or illegitimacy, is a legal condition, a state has the power to define what constitutes it, to regulate it, or even to abolish any distinctions founded upon it, as, for example, by changing the legal status of an illegitimate child to that of a legitimate child (i. e., "legitimating" him). "(T)he subject of legitimation * * * is a proper one for state legislation." In re Lund's Estate, 26 Cal.2d 472, 159 P.2d 643, 649-50 (1945).
 
 
 45
 We deem it incontestable that each state may formulate its own public policy in respect to legitimation and can enact laws to carry out its policy. There is no federal constitutional proscription against a state's adopting legislation which makes legitimate within the operation of its laws children who are illegitimate in other jurisdictions * * *.
 
 
 46
 Id., 159 P.2d at 651.
 
 
 47
 Every American state has by statute provided methods for parents to legitimate their illegitimate children. See generally Clark, Law of Domestic Relations § 5.2 (1968). At least two states (Arizona, Ariz.Rev.Stat. § 8-601; and Oregon, Or.Rev.Stat. § 109.060) have statutes making all children the legitimate children of their natural parents, thus basing "legitimacy" solely on the biological relationship of parents and child. The Oregon statute provides:
 
 
 48
 The legal status and legal relationships and the rights and obligations between a person and his descendants, and between a person and his parents, their descendants and kindred, are the same for all persons, whether or not the parents have been married.
 
 
 49
 Or.Rev.Stat. § 109.060 (1971). While the next section of the Oregon statute, § 109.070, lists methods by which the paternity of a person may be established, there is in § 109.060 no requirement that the child's paternity be established. Nor is this in any way surprising, for a paternity proceeding is intended to establish the identity of the father, while legitimation which pursuant to this statute is universal establishes the legal status of the child.
 
 III
 
 50
 With this background, we turn to the Marriage Law of the People's Republic of China. Promulgated on May 1, 1950, only seven months after the People's Republic itself was proclaimed
 
 
 51
 this revolutionary law did not only cover the subject suggested by its title, but was intended to cause such fundamental changes in the existing family that it may be safely said to have aimed at family revolution by destroying all former patterns of family law and building up new relationships on the basis of a new law and new ethics.[10]
 
 
 52
 Article 15 of Chapter IV of the PRC Marriage Law, entitled "Relations Between Parents and Children," provides:
 
 
 53
 Children born out of wedlock shall enjoy the same rights as children born in lawful wedlock. No person shall be allowed to harm them or discriminate against them.
 
 
 54
 Where the paternity of a child born out of wedlock is legally established by the mother of the child or by other witnesses or by other material evidence, the identified father must bear the whole or part of the cost of maintenance and education of the child until the age of eighteen.
 
 
 55
 With the consent of the mother, the natural father may have custody of the child.
 
 
 56
 With regard to the maintenance of a child born out of wedlock, in case its mother marries, the provisions of Article 22 shall apply.[11]
 
 
 57
 It is clear to us that the first paragraph of this Article makes all children born in China "legitimate." We are not persuaded by the government's argument that the second paragraph of Article 15, dealing with paternity, makes the establishment of paternity by means of some legal procedure a prerequisite to a child's legitimacy. Put quite simply, the second paragraph says only that a man may not be charged with the cost of maintaining and educating a child until it is proved that the man is the natural father of the child. This, we believe, is quite distinct from the first paragraph of the Article which is a legislative grant of legitimacy to all children born in the People's Republic of China.
 
 
 58
 The District Court, while concluding that a paternity suit is not necessary to determine the legitimacy of a child born out of wedlock, nonetheless declined to hold that Article 15 makes all children legitimate, for "Chinese law still draws at least a semantic distinction between 'children born out of wedlock' and 'children born in lawful wedlock.' " 410 F.Supp. at 224. We believe, however, that this "semantic distinction" merely recognizes the fact of life that not all children are born to married parents, and that the first two paragraphs of Article 15, taken together, reflect an awareness, on the part of those who drafted the Chinese law, of the distinction, long known to our own common law commentators, between legitimacy as a legal construct and paternity as a biological fact.
 
 
 59
 We find corroboration of our view in the writings of the experts on Chinese law cited by Lau in the District Court, whose authority and views have not been challenged by the government. For example, Meijer, Marriage Law and Policy in the Chinese People's Republic, states, at page 208, that a child born out of wedlock "has the status of a child born in wedlock," and at page 227, that "the ties between parents and children are not based on the marriage of the parents but on the blood relationship existing between them."
 
 
 60
 The Immigration Service has, perhaps, misled itself by concentrating too closely on the language of the translation of Article 15. That translation, albeit published by the leading Peking Foreign Languages Institute, is not an official translation. Meijer, supra, at 71. Examined in the original, it is seen to be misleading in two points which, in the context of the present case, take on paramount importance. The first is that the terms translated as "children born out of wedlock" and "children born in lawful wedlock" when literally translated are "non-marriage-born children" and "marriage-born children." The second point arises because the Service has focused on the words "legally established" in the second paragraph, in the clause "Where the paternity of a child born out of wedlock is legally established * * *," as indicative of the existence of some legal procedure, and no legal procedure in China was followed by Chin Lau. The phrase "legally established" does not exclude methods of establishment other than court orders.
 
 
 61
 In making so much of one or another word, the Service has failed to take into account that the Chinese Communists believed, especially during the period when this law was drafted, that legal language should be easy to understand, simply and straightforward, and, wherever possible, free of jargon. See Victor H. Li, The Role of Law in Communist China, 44 The China Quarterly 66, 81 (Oct.-Dec. 1970). Moreover, strict compliance with legalistic procedures is a concept foreign to China.
 
 
 62
 The non-legal background of the Communists was reinforced by the traditional attitude of paying little attention to law. Although a formal legal system had existed in China for many centuries, whenever possible people avoided resorting to it.
 
 
 63
 Id. at 92.
 
 
 64
 Because we conclude that Chinese law makes all children "legitimate," we need not consider the secondary question of whether there is a procedure in China for "legitimating" a child. Under our view of Chinese law such a procedure would, of course, be superfluous, and we note that none of the authorities submitted to us or discovered from our own research suggests that one exists.
 
 
 65
 We hold that Kin Kok Lau is a "legitimate child" for the purposes of section 101(b)(1) of the Immigration & Nationality Act, 8 U.S.C. § 1101(b)(1). The only undecided factual question is whether Kin Kok Lau is the legitimate child of this petitioner, Chin Lau. Inasmuch as all children born in the PRC are legitimate, it is obviously important for a person petitioning for a visa preference on behalf of his child who was born in the PRC to prove that the beneficiary of his petition is his child. Evidence was introduced that China does not issue birth certificates, and it appears that there is no routine procedure in China for establishing paternity.[12] Of course the mere statement of a visa preference petitioner that a person born in the People's Republic of China is his "child" should be supported by other credible evidence satisfactory to the INS lest abuse of the preferential visa law be encouraged. Such other evidence, such as that offered by Chin Lau, may show the existence of a parent-child relationship between the petitioner and the beneficiary, or that the petitioner supported the beneficiary, or tend to prove anything else relevant to the question. Because the District Director and then the Board of Immigration Appeals each held that it was unnecessary to reach this question, neither of them considered the evidence offered by Chin Lau to prove that Kin Kok Lau is indeed his natural son. We adopt the procedure ordered by the District Court below and as we have declared the beneficiary of Lau's petition, Kin Kok Lau, to be "a legitimate child" for purposes of section 101(b)(1) of the Immigration & Nationality Act, 8 U.S.C. § 1101(b)(1), we affirm the judgment order of the District Court and remand to the Board of Immigration Appeals for its consideration limited to whether petitioner's testimony and evidence can satisfy the Service that Kin Kok Lau is the natural son of petitioner.
 
 
 
 *
 Of the United States District Court for the District of Connecticut, sitting by designation
 
 
 [1]
 Section 201(a) of the Act, 8 U.S.C. § 1151(a)
 
 
 [2]
 Section 202(a) of the Act, 8 U.S.C. § 1152(a)
 
 
 [3]
 The remaining preference classes are: third, ten percent of the hemispheric limit to qualified immigrants who are members of the professions or are exceptionally skilled in the sciences or arts and whose services are sought by a United States employer; fourth, ten percent to qualified immigrants who are the married sons or daughters of United States citizens; fifth, twenty-four percent to qualified immigrants who are the brothers or sisters of United States citizens and are at least twenty-one years old; sixth, ten percent "to qualified immigrants who are capable of performing specified skilled or unskilled labor, not of a temporary or seasonal nature, for which a shortage of employable and willing persons exists in the United States"; and, seventh, up to six percent of the hemispheric limit is made available for conditional entries by certain types of refugees. 8 U.S.C. § 1153(a). In addition to the visas allotted to each preference class, any visas not required for a prior preference class are available for a subsequent preference class. Any authorized visas not required for issuance to any of the preference classes or for conditional entries or visas (under the seventh listed class) are available to other qualified immigrants in the order in which they qualify. Obviously, since the preference allotments total 100 percent of the hemispheric allowance, a prospective immigrant who fits no preference class will have a greatly reduced chance of obtaining an immigrant visa
 
 
 [4]
 Subsection (D) of this section provides another category of "child," i. e., "an illegitimate child, by, through whom, or on whose behalf a status, privilege, or benefit is sought by virtue of the relationship of the child to its natural mother." Lau had originally challenged the constitutionality of this subsection, arguing that it violates the natural father's right to equal protection of the laws. He abandoned this point when the statute's constitutionality was upheld by the Supreme Court against virtually the same challenge in Fiallo v. Bell, 430 U.S. 787, 97 S.Ct. 1473, 52 L.Ed.2d 50 (1977)
 
 
 [5]
 The District Director of the Immigration and Naturalization Service has been designated as the Attorney General's representative for considering, among other matters, preference petitions. 8 C.F.R. § 100.2 (1976)
 
 
 [6]
 Appendix, at A10-A11
 
 
 [7]
 See n.4, supra
 
 
 [8]
 Complaint paragraph 3; Appendix at A7
 
 
 [9]
 Lau filed a notice of cross-appeal from the District Court's judgment. Presumably he sought to appeal the failure of the court to rule on the constitutionality of § 101(b)(1)(D). (See n.4, supra.) That issue has been removed from the case following the Supreme Court's decision in Fiallo v. Bell, 430 U.S. 787, 97 S.Ct. 1473, 52 L.Ed.2d 50 (1977), and, at any rate, to the extent Lau sought to appeal from the District Court's failure to grant the full measure he sought in his motion for summary judgment, in his presentation to the Court of Appeals he only sought an affirmance of the remand
 
 
 [10]
 M. J. Meijer, Marriage Law and Policy in the Chinese People's Republic 5 (1971)
 
 
 [11]
 Article 22 of the Marriage Law of the PRC provides:
 In the case where a divorced woman remarries and her husband is willing to pay the whole or part of the cost of maintaining and educating the child or children by her former husband, the father of the child or children is entitled to have such cost of maintenance and education reduced or to be exempted from bearing such cost in accordance with the circumstances.
 
 
 [12]
 Even if China has a paternity proceeding, Chin Lau obviously cannot avail himself of it now