**Kuli Haapai KAHO, Valeti Kaho and Tupou Kaho, Plaintiffs-Appellees,**

v.

**David N. ILCHERT, District Director, Immigration and Naturalization Service, Defendant-Appellant.**

No. 83–2534.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 8, 1985.

Decided July 10, 1985.

Terry J. Helbush, Simmons & Ungar, Lawrence N. DiCostanzo, on brief, San Francisco, Cal., for plaintiffs-appellees.

Larry J. Gallagher, San Francisco, Cal., for defendant-appellant.

Before HALL and WIGGINS, Circuit Judges, and SMITH *, District Judge.

WIGGINS, Circuit Judge:

David N. Ilchert, San Francisco District Director for the Immigration and Naturalization Service, (Ilchert), appeals from the district court's decision granting summary

---

* Honorable Russell E. Smith, United States District Judge for the District of Montana, sitting by designation.

judgment in favor of Kuli Haapai Kaho and his adopted daughters and remanding the case to the Immigration and Naturalization Service (INS) for a determination whether there was a *bona fide* customary adoption of Valeti and Tupuo Kaho by Kuli Haapai Kaho. We must decide whether the district court erred in conducting a *de novo* review on the validity of customary adoptions under Tongan law and whether customary adoptions are valid under Tongan law. We affirm.

## FACTS

■ On October 19, 1980, Kuli Haapai Kaho (Kaho), a lawful permanent resident of the United States, filed two petitions for immigrant visa preference status under 8 U.S.C. § 1154 on behalf of Valeti Kaho and Tupuo Kaho.[1] Kaho claimed that he adopted Valeti and Tupuo under the customary laws of Tonga [2] and therefore, they were eligible for second preference immigrant visas under 8 U.S.C. § 1153(a)(2).[3] When the petitions were filed, Valeti was 22 and Tupuo was 16.

Valeti and Tupuo were born in Tonga in 1958 and 1963, respectively, as the legitimate offspring of their natural parents. When Valeti was 7 years old and Tupuo 3 years old, their natural mother died. Following the mother's instructions, their natural father entrusted Valeti and Tupuo to the care of Kuli Haapao Kaho, a cousin of their natural mother.

On November 3, 1981, Ilchert denied Kaho's petitions for preference classifications for Valeti and Tupuo. Ilchert concluded that customary adoptions were not legally recognized in Tonga and therefore, as a matter of law, the adoptions of Valeti and Tupuo could not be recognized as valid adoptions under 8 U.S.C. § 1101(b)(1)(E). Relying on its previous decisions in *Matter of Fakalata,* 18 I. & N. Dec. 213 (BIA 1982), and *Matter of Palelei,* 16 I. & N.Dec. 716 (BIA 1979), the Board of Immigration Appeals (BIA) affirmed Ilchert's decision.

On November 29, 1982, Kuli, Valeti and Tupuo Kaho (the Kahos) filed the present action in district court seeking declaratory and injunctive relief. Specifically, they sought: (1) a declaration that the denial of their applications for visa petitions was unlawful because it was based on misconstructions of the pertinent sections of the Immigration and Nationality Act (the Act) and Tongan law, and (2) an injunction requiring the INS to grant their visa applications.

The parties filed cross-motions for summary judgment. On May 6, 1983, the district court entered its order disposing of the summary judgment motion.

1. Under the Immigration and Nationality Act (the Act), a limited number of immigrant visas are allowed for each fiscal year. 8 U.S.C. § 1151. Congress established a six-tier preference system to afford preferential treatment for the issuance of immigrant visas to individuals qualifying under these categories. 8 U.S.C. § 1153(a)(1)–(6). This preference system was "primarily designed to further the [Act's] basic objective of reuniting families and also to attract to this country aliens with needed skills." *Lau v. Kiley,* 563 F.2d 543, 544 (2d Cir.1977) (citing S.R. No. 748, 89th Cong., 1st Sess. 13, *reprinted in* 1965 U.S.Code Cong. & Admin. News 3328, 3332).

2. A customary adoption is an adoption created by operation of custom, i.e.—a common law adoption. *See e.g. Matter of Nq,* 14 I. & N.Dec. 135 (BIA 1972); *Matter of Poon,* 14 I. & N.Dec. 155 (BIA 1972).

3. Section 1153(a)(2) gives second preference status to unmarried sons and daughters of lawful permanent residents for the issuance of immigrant visas.

To qualify as a "son or daughter" under section 1153, the beneficiary must once have qualified as a "child" of the petitioner under 8 U.S.C. § 1101(b).

A parent may qualify an adopted child for second class preference under section 1153(a)(2) if the child was adopted pursuant to the requirements of section 1101(b)(1)(E).

The statute in force when Kaho filed his petitions provided in relevant part:

The term child means an unmarried person under twenty-one years of age who is—

A child adopted while under the age of fourteen years if the child has thereafter been in the legal custody of, and has resided with, the adopting parent or parents for at least two years: *Provided,* That no natural parent of any such adopted child shall thereafter, by virtue of such parentage, be accorded any right, privilege, or status under this [Act].

8 U.S.C. § 1101(b)(1)(E) (1980).

Deferring to the INS's interpretation of 8 U.S.C. § 1101(b)(1)(E), the district court concluded that this section requires more than a showing of a parent and child relationship. The district court held that section 1101(b)(1)(E) requires that an adoption be *legally* recognized under the law of the country where the adoption took place.

In reviewing whether customary adoptions are legally recognized under the law of the Kingdom of Tonga, the district court did not defer to the INS's interpretation of Tongan law. The district court reviewed the issue *de novo*.

In light of the evidence introduced in the district court proceedings, the court concluded that customary adoptions were recognized under Tongan law. Accordingly, the district court remanded the matter to the INS with respect to Tupuo to determine whether there had been a *bona fide* customary adoption by Kaho and to grant the petition upon a finding of a *bona fide* adoption. Because Valeti was 22 years old when the petition was filed, the district court believed that she did not qualify as a "child" under the Act. Therefore, with respect to Valeti, the district court granted partial summary judgment in favor of Ilchert.

■ The Kahos moved the district court to alter the judgment on the ground that it misapplied the law as to Valeti's eligibility to qualify for a visa petition. The Kahos correctly asserted that Valeti was not barred from qualifying for a preference visa under section 1153(a)(2) merely because she was over 21 years of age when the petition was filed.[4]

The district court granted the Kahos' motion to alter the judgment and remanded the matter to the INS with respect to Valeti as well. Final judgment was entered on September 6, 1983.

---

4. An unmarried, adopted person over 21 years of age may qualify for a second preference visa if he or she once satisfied the requirements of section 1101(b)(1)(E). *See Kaliski v. District*

## DISCUSSION

### I.

### JURISDICTION

#### A. Appealability of District Court's Remand Order

A threshold question is whether the district court's judgment remanding the matter to the INS for further proceedings is a final appealable order under 28 U.S.C. § 1291.

In *Stone v. Heckler*, 722 F.2d 464 (9th Cir.1983), we ruled on the finality of a district court order remanding the case to the administrative agency, wherein the district court had conclusively determined a "separable legal issue." Specifically, the district court in *Stone* held that the Secretary of Health and Human Services had applied an incorrect legal standard. The district court, therefore, remanded the case to the Secretary for application of the correct standard. The Secretary appealed, challenging the district court's determination that she applied an incorrect standard in her administrative decision.

In deciding whether the district court's remand order was final, we noted that 28 U.S.C. § 1291 was to be given a practical construction. *Id.* at 467. We proceeded to weigh "the inconvenience and costs of piecemeal review" against "the danger of denying justice by delay." *Id.* (quoting *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 171, 94 S.Ct. 2140, 2149, 40 L.Ed.2d 732 (1974)).

We recognized that if the district court's decision were wrong, it "would result in a totally wasted proceeding below, from which the Secretary may not be able to appeal." *Id.* Judicial economy and fairness would both be promoted by resolving the legal issue on appeal. In light of these considerations, we concluded that the remand order was appealable under section 1291. *Id.* at 468.

---

*Director of INS*, 620 F.2d 214, 215 (9th Cir.1980); *Nazareno v. Attorney General*, 512 F.2d 936 (D.C. Cir.), *cert. denied*, 423 U.S. 832, 96 S.Ct. 53, 46 L.Ed.2d 49 (1975).

■ Applying the analysis in *Stone* to the present case, we are convinced that the district court's remand order should be deemed a final appealable order. Two separable legal issues are presented. Moreover, if the district court erred in concluding that customary adoptions are legally recognized in Tonga, further administrative proceedings would be a waste. Furthermore, as in *Stone*, the administrative agency involved in this case might not be able to secure judicial review of the issues presented in this appeal unless review is granted now. Appellate jurisdiction under section 1291 is therefore proper. *See Lau v. Kiley*, 563 F.2d 543 (without discussing jurisdictional question, court ruled on merits of appeal from district court remand order to BIA).

## II.

## MERITS

### A. District Court Review

■ The central issue before the district court was whether the INS abused its discretion in denying Kaho's petitions for preference visas. The INS abuses its discretion if its decision is not supported by the evidence or if it is based on an improper understanding of the law. *Kaliski v. District Director*, 620 F.2d at 216 n. 1. In order to determine whether the INS abused its discretion, the district court had to resolve two legal issues: (1) the proper interpretation of section 1101(b)(1)(E) and (2) the validity of customary adoptions under the law of Tonga.

Before us, Ilchert contends that the district court failed to give proper deference to the INS's interpretation of section 1101(b)(1)(E) and to its interpretation of foreign law. We disagree.

In ruling upon Kaho's challenge to the INS's interpretation of section 1101(b)(1)(E), the record demonstrates that the district court properly deferred to the INS's interpretation of that section. The district court agreed with Ilchert that to satisfy the requirements of section 1101(b)(1)(E), the adoption must be legally recognized under the law of the country where the adoption took place.

With respect to the question of the validity of customary adoptions under Tongan law, the district court did not defer to the INS's conclusion; instead, the district court reviewed this issue *de novo*. We reject Ilchert's contention that the district court erred in so doing.

■ Fed.R.Civ.P. 44.1 governs a district court's determination of foreign law. Rule 44.1 provides:

A party who intends to raise an issue concerning the law of a foreign country shall give notice in his pleadings or other reasonable written notice. The court, in determining foreign law, may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence. The court's determination shall be treated as a ruling on a question of law.

The provisions of Rule 44.1 indicate that a deferential standard of review on a question of foreign law is inappropriate. Under Rule 44.1, a district court may consider material that was not before an agency. Where the district court considers material that was not before the agency, as occurred in this case, deferrence to the agency's interpretation on the question of foreign law is misplaced.

■ Furthermore, the INS is not charged with administering "foreign law." It also does not have any greater expertise on questions of foreign law than does the district court—or this court. In light of these considerations, we are satisfied that the district court properly reviewed the question of foreign law before it under the *de novo* standard. *See Lau v. Kiley*, 410 F.Supp. 221, 223–25 (S.D.N.Y.1976), *aff'd*, 563 F.2d 543 (2d Cir.1977) (district court reviewed *de novo* issue of legitimate births under Chinese law).

Ilchert relies heavily upon the majority opinion in *Mila v. District Director of Denver*, 678 F.2d 123 (10th Cir.1982), *cert. denied*, 459 U.S. 1104, 103 S.Ct. 726, 74

L.Ed.2d 952 (1983), to support his claim that the district court should have deferred to the INS's interpretation of foreign law. Our reading of the *Mila* opinion convinces us that Ilchert's reliance on this case is misplaced.[5]

The issue before the district court and the appellate court in *Mila* was whether the INS's interpretation of section 1101(b)(1)(E) to require that the adoption be legally recognized under the laws of the country where the adoption took place was erroneous. The district court agreed with the plaintiff's assertion that the INS's interpretation of section 1101(b)(1)(E) was unduly restrictive. *Mila v. District Director,* 494 F.Supp. 998, 1000 (D.Utah 1980). The district court held that only a bona fide parent-child relationship was required to satisfy section 1101(b)(1)(E). *Id.*

On appeal, the Tenth Circuit reversed. 678 F.2d 123. The majority held that the INS's interpretation of section 1101(b)(1)(E) was reasonable and, therefore, the district court erred in failing to defer to it. *Id.* at 126.

The issues whether the BIA's determination regarding the validity of customary adoptions under Tongan law was correct and whether a district court must defer to an agency's determination of foreign law were not before either court in *Mila.* Thus, neither court in *Mila* addressed the issue before the district court and now before us, i.e.—did the BIA err in concluding that customary adoptions do not create valid adoption relationships recognized under Tongan law? *Mila,* therefore, is inapposite on the question of the standard of review a district court must apply when reviewing an agency's determination of foreign law.

To the extent that the Tenth Circuit's opinion in *Mila* can be interpreted to hold

that a district court must defer to an agency's interpretation of foreign law, we disagree with such a holding and decline to adopt it as the law of our circuit.

In summary, in reviewing the district court interpretation of section 1101(b)(1)(E), the district court properly deferred to the INS's interpretation of this statute. In reviewing the legal status of customary adoptions under Tongan law, the district court properly conducted a *de novo* review of the foreign law.

### B. Customary Adoptions

■ Next we must decide whether the district court erred in holding that customary adoptions were legally recognized under the Tongan law. We review a district court's determination on a question of foreign law under the *de novo* standard. *Matter of McLinn,* 739 F.2d 1395, 1398 (9th Cir.1984); *United States v. Vetco, Inc.,* 691 F.2d 1281, 1285 (9th Cir.), *cert. denied,* 454 U.S. 1098, 102 S.Ct. 671, 70 L.Ed.2d 639 (1981).

### a. BIA on Tongan Law

In *Matter of Fakalata,* 18 I. & N.Dec. 213 (BIA 1982), the BIA held that customary Tongan adoptions do not create a legal status or relationship under Tongan law and therefore are not legally valid. In so holding, the BIA reaffirmed its decision in *Matter of Palelei,* 16 I. & N.Dec. 716 (BIA 1979). In reaching this conclusion in *Fakalata,* the BIA relied heavily upon two letters of the Tongan Crown Solicitor, a section of the Tongan Constitution prohibiting the inheritance of land by customary adoptees, and an article entitled "Tongan Adoption" by Keith L. Morton, included in *Transactions in Kinship—Adoption and Fosterage in Oceania* (I. Brady ed. 1976). 18 I. & N.Dec. at 214–18.

---

**5.** To the extent that Ilchert relies on *Udall v. Tallman,* 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965); *Power Reactor Dev. Co. v. International Union,* 367 U.S. 396, 81 S.Ct. 1529, 6 L.Ed.2d 924 (1961); *Unemployment Compensation Comm'n v. Aragon,* 329 U.S. 143, 67 S.Ct. 245, 91 L.Ed. 136 (1946); and *Gray v. Powell,* 314 U.S. 402, 62 S.Ct. 326, 86 L.Ed. 301 (1941), to support his

contention that the court should have deferred to the agency's interpretation of foreign law, he is wrong. These cases stand for the proposition that courts should afford considerable deference to an agency's interpretation of the statutes and regulations which the agency administers. As noted above, the district court properly deferred to the INS's interpretation of the Act.

In his first letter the Crown Solicitor of Tonga stated:

> There is no provision in our law for the adoption of children born legitimately. Nevertheless it has been a common practice in Tonga for relatives to raise and maintain children, including legitimate children as part of the family and to treat them in all respects as if they were legally adopted. Such "adoption" does not give the child any legal right in the estate of the foster parent and is not recognized as legally valid under Tongan law.

*Matter of Palelei,* 16 I. & N.Dec. at 718.[6]

The second letter of the Crown Solicitor, dated July 18, 1980, reads in its entirety:

> TO WHOM IT MAY CONCERN:
>
> On January 16, I wrote a letter to Mr. Kersi B. Shroff of the Library of Congress of the United States responding to a letter he wrote me requesting my opinion concerning the legal effect of Tongan customary adoptions.
>
> In that letter I stated: "Such 'adoption' does not give the child any legal rights in the estate of the foster parent and is not recognised (sic) as legally valid under Tongan law."
>
> In Tonga, there is no reported "law" concerning parental rights and duties and children's rights and duties when customarily adopted. Tongan customary adoptions are an important aspect of our traditional culture and continue to be practiced today very commonly. There is no need for anyone to go to the courts to enforce parental rights or duties or children's rights or duties because everyone understands that customarily adopted children are treated in all respects as if they were legally adopted except that they cannot inherit. Even illegitimate children adopted according to our statutory law cannot inherit, but they also are considered legally adopted.
>
> Customary adoptions used to (sic) prior to our Constitution allow the adopted children to succeed to estates and titles, but the Constitution forbade the inheri-

tance or succession by adopted children. But the Constitution did not outlaw customary adoptions. They have continued until this day. Many families in Tonga have one or more members who are adopted. The adopted children cannot succeed to the estates of their parents, but in all other ways, they are considered the real children of their adopting parents. Such adoptions have the effect in Tonga of creating a parent and child relationship.

The section of the Morton monograph primarily relied upon by the BIA in *Fakalata* reads: "The Tongan government sanctions only a few of these adoptions. Few applications for legal adoptions are made to the courts because the circumstances of Tongan adoption are often incongruent with the European model of adoption applied in the courts." *Matter of Fakalata,* 18 I. & N.Dec. at 215–16. The BIA also emphasized Morton's suggestion "that an adoption may be obtained through application to the courts which is recognized by Tongan law as according rights of succession to the adopted child." *Id.* at 217. In light of Morton's comments the BIA stated, "if a means of acquiring legal sanction for an adoption is available, we believe that our immigration laws would require a person seeking immigration benefits on the basis of an adoption in Tonga to obtain endorsement of law in that matter." *Id.*

Based upon its interpretation of these sources, the BIA concluded that customary adoptions do not create a legal status or relationship under Tongan law and, therefore, it would not recognize such adoptions to be valid for immigration purposes. *Id.*

The district director and the BIA found the decisions in *Palelei* and *Fakalata* dispositive of Kaho's petitions for visa petitions.

b. *District Court Review*

In ruling on the issue whether customary adoptions are legally recognized under the laws of Tonga, the district court considered the material which the BIA had before it in

---

6. Only the first letter of the Crown Solicitor was considered by the BIA in *Palelei.*

*Fakalata and* additional evidence such as an extensive affidavit of Dr. George Marcus [hereinafter Marcus affidavit], an anthropologist and Chairman of the Department of Anthropology at Rice University in Houston, Texas.[7]

Based on its interpretation of the evidence before it and considering the Congressional purpose behind section 1101(b), the district court concluded that customary adoptions were legally recognized under the laws of Tonga. In rejecting the BIA's determination regarding the validity of customary adoptions, district court stated:

> The ironic effect of the INS's approach to Tongan customary adoptions may be that only those customary adoptees whose adoptive status was disputed in Tonga may acquire preference visas, because they are the only customary adoptees who would have sought and obtained Tongan judicial sanction. Customary adoptees whose good faith adoptive status no one disputed would never have required recourse to courts; lacking a judicial decree recognizing their adoptive status, they would be *per se* precluded from obtaining preference visas. The effect is contrary to congressional (sic) intent.

#### c. *Appellate Review*

On appeal, Ilchert urges us to adopt the BIA's determination in *Fakalata.* Finding the BIA's decision in *Fakalata* flawed in several significant respects we decline to do so.

Our review of the Crown Solicitor's second letter convinces us that he has retracted his original conclusion that customary adoptions have no legal effect in Tongan law. In his second and most recent letter, the Crown Solicitor stated that customary adoptions have the effect of creating a parent/child relationship recognized under Tongan law. The Crown Solicitor explained that there was no need to resort to courts to enforce the rights and responsibilities of such a relationship "because everyone understands that customarily adopted children are treated in all respects as if they were legally adopted except that they cannot inherit." This statement by the Crown Solicitor demonstrates that the BIA misconstrued Morton's comment regarding judicial approval of adoptions in Tonga.

With respect to the prohibition on inheritance the Crown Solicitor added, "[e]ven illegitimate children adopted according to our statutory law cannot inherit, but they *also* are considered legally adopted." (Emphasis added). A logical reading of this statement, in context, makes clear that the Crown Solicitor was referring to customary adoptees as being considered "legally adopted" under Tongan law. We are also satisfied that the affidavit of Dr. Marcus reinforces the Crown Solicitor's statement that customary adoptions are legally recognized under Tongan law.

In light of the record before us, we cannot agree with the BIA's view that the lack of a statutory procedure for the adoption of legitimate children compels a determination that customary adoptions are not recognized under Tongan law. Dr. Marcus provides a reasonable explanation why there exists a statutory provision for the adoption of illegitimate children but no such provision for the adoption of legitimate children. Dr. Marcus explains that the statutory provision for adoption of illegitimate children was enacted in anticipation of challenges to the adoption by the parents of the illegitimate child. Adoption of illegitimate children under Tongan custom does not require the father's consent. The mother is frequently pressured into consenting to the adoption. Because such adoptions are "more a matter of expediency and necessity than a matter of consensual transaction as between two sets of parents as in the usual 'pusiaki' adoption,"[8]

---

7. Ilchert does not challenge the Marcus affidavit on any point. Ilchert simply maintains that the BIA's decision in *Fakalata* is correct.

8. A "pusiaki" adoption is the adoption of a child between persons related by blood. The present case involves such an adoption.

the parents are likely to attempt to reclaim their child. The statutory provision thus affords the adopting parents some measure of security. Such a safeguard is not necessary for customary adoption of legitimate children because of their consensual nature.

Dr. Marcus adds that Tongan courts will enforce the rights and duties stemming from "pusiaki" adoptions. Specifically, Dr. Marcus explains: "Where relevant to the case, a magistrate will measure the strength and validity of adoption by attempting to determine the circumstances of the adoption transaction and the history of role-playing between parent and child. If the adopter and adoptee have conformed to the behavioral rights and duties of parent-child relationship, and moreover, if the adopted child has performed the duties of siblings in its adopted family, then the validity of the adopted tie is not only recognized but takes precedence over any competing claims or versions of the relationship, whatever the specific issue in dispute." Dr. Marcus further explains that pusiaki adoptions may be given effect by the Tongan Land Courts.

The BIA has expressly held that it is *not necessary* for an adoption to be recognized by a juridical act before it can be recognized as valid for immigration purposes. *See Matter of Kwok*, 14 I. & N.Dec. 127, 130 (BIA 1972). Thus, the BIA's suggestion in *Fakalata* that it would require judicial approval before it will recognize an adoption as valid for immigration purposes, 18 I. & N.Dec. at 217, conflicts with *Kwok*. We find the BIA's position in *Kwok* more consistent with the Act's purpose to reunite families.

In *Fakalata*, the BIA also found significant to its determination the Tongan constitutional prohibition against adopted children succeeding to the estates and titles of their adopted parents. 18 I. & N.Dec. at 217. Closer study of this constitutional prohibition reveals that it does not support

the conclusion that customary adoptions are not legally recognized in Tonga.

The second letter of the Crown Solicitor states that the constitutional prohibition applies to judicially adopted children as well as to customarily adopted children. Dr. Marcus further explains that the constitutional provision concerns the law of succession to title and estates [9] and is not a complete bar to inheritance by adopted children. Dr. Marcus adds that the prohibition refers only to adoption between strangers not to pusiaki adoptions.

If the BIA concludes that it cannot recognize customary adoption of children because of this inheritance prohibition, it would be forced to conclude that adoptions of illegitimate children, which are expressly provided for by statute under Tongan law, also cannot be recognized. A conclusion that the statutory adoption of illegitimate children is not valid under Tongan law would be contrary to the BIA's interpretation of section 1101(b)(1)(E).

In *Fakalata*, the BIA also refused to recognize customary adoptions as legally valid because the relationship between the adopted child is not "exclusive." 18 I. & N.Dec. at 216. In Tonga, an adopted child may maintain ties with his or her natural parents and may elect to emphasize those ties. In light of the "fluidity" of Tongan customary adoptions, the BIA concluded "a system which gives an adopted child the option to maintain a legal relationship with his natural parents is inconsistent with *our concept of adoption* and with [section 1101(b)(1)(E) ]." *Id.* (emphasis added).

■ The flaw in the BIA's analysis is clear. For an adoption to be valid under section 1101(b)(1)(E), an adoption need not conform to the BIA's or Anglo-American notions of adoption; the adoption need only be recognized under the law of the country where the adoption occurred. *See Matter of Kwok*, 14 I. & N.Dec. 127. In addition, the BIA confuses the legal issue—whether Tongan customary adoptions are legally

---

9. Dr. Marcus emphasizes that with respect to inheriting movable and personal property, no distinction is made between adopted and natural children.

recognized—with the factual issue—whether a *bona fide* customary adoption ever took place in a given case.

Ilchert's contention that the fluidity of Tongan customary adoptions would create an unacceptable potential for fraud and manipulation is unpersuasive. The INS is quite capable of ferreting out fraudulent claims. A petitioner seeking classification for a relative bears the burden of demonstrating that an adoption took place. The INS can ably scrutinize the evidence submitted in support of the petition and determine whether a *bona fide* customary adoption *in fact* occurred under the particular circumstances presented. Furthermore, the specific requirements of section 1101(b)(1)(E) minimize the possibility of fraud.

■ In summary, the BIA's analysis in *Fakalata* is unsound and we decline to follow it. The record before us demonstrates that customary adoptions are valid under Tongan law.

The district court properly concluded that the INS abused its discretion in denying Kaho's visa petitions. A remand to the BIA for it to determine whether there existed a *bona fide* customary adoption of Valeti and Tupuo by Kaho was proper.

AFFIRMED.