**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

GARY ANDERSON, a.k.a. Gary
Sinclair,
                    *Petitioner,*

            v.

ERIC H. HOLDER Jr., Attorney
General,
                    *Respondent.*

No. 07-74042

Agency No.
A017-088-680

GARY ANDERSON,
                    *Petitioner,*

            v.

ERIC H. HOLDER Jr., Attorney
General,
                    *Respondent.*

No. 08-73946

Agency No.
A017-088-680

GARY ANDERSON,
                *Petitioner-Appellant,*

            v.

ERIC H. HOLDER Jr., Attorney
General,
                *Respondent-Appellee.*

No. 10-16491

D.C. No.
2:09-cv-02519-
WBS-JFM

OPINION

Appeal from the United States District Court
for the Eastern District of California (No. 10-16491)
William B. Shubb, District Judge, Presiding

2887

On Petitions for Review of Orders of the
Board of Immigration Appeals
(Nos. 07-74042, 08-73946)

Argued and Submitted
October 14, 2011—San Francisco, California

Filed March 12, 2012

Before: Betty B. Fletcher, Stephen Reinhardt, and
A. Wallace Tashima, Circuit Judges.

Opinion by Judge Reinhardt

## COUNSEL

Cynthia J. Larsen, Stacy E. Don (argued), and Stephanie F. Zook, Orrick, Herrington & Sutcliffe LLP, Sacramento, California, for the petitioner.

Tony West, Assistant Attorney General; J. Max Weintraub, Senior Litigation Counsel, Leslie McKay, Assistant Director, Kirsten L. Daeubler (argued), Trial Attorney, and Jane T. Scaffner, Trial Attorney, U.S. Department of Justice, Civil

Division, Office of Immigration Litigation, Washington, D.C., for the respondent.

## OPINION

REINHARDT, Circuit Judge:

This case requires us to apply a 1952 statute to circumstances far removed from those that the enacting Congress imagined. Gary Anderson, born in England to an American serviceman father and an English mother, is a citizen of the United States if and only if his "paternity . . . [was] established while [he was] under the age of twenty-one years by legitimation." 8 U.S.C. § 1409(a) (1952) ("Former § 1409(a)"). When Congress enacted this law, it believed that "[a]s a general proposition, legitimation is accomplished by the marriage of the parents with acknowledgment of paternity by the putative father." S. Rep. No. 81-1515, at 692-93 (1950). The law of Arizona—one of the states in which Anderson resided before the age of twenty-one—lacked any such requirement, however. Instead, it provided that "[e]very child is . . . the legitimate child of its natural parents." 1975 Ariz. Sess. Laws ch. 117, § 2 (codified at Ariz. Rev. Stat. § 8-601). The question we face is how to reconcile the language of Former § 1409(a) with a state statutory scheme in which it makes little sense.

Although Anderson's biological father had no contact with him for more than four decades after his birth, there is no question that he is one of Anderson's "natural parents." Because Anderson was a legitimate son of his natural parents under Arizona law, and because the identity of his natural father is and has always been undisputed, he appears to have met the requirements of Former § 1401(a)(7). We must, however, address two questions of law before arriving definitively at this conclusion: first, whether "legitimation" requires an

affirmative act, as the district court held, rather than simply the status of being legitimate; and second, whether Anderson's paternity was "established" under Arizona law. Answering the first question in the negative and the second in the affirmative, we hold that Anderson is a citizen of the United States and remand to the agency to vacate the removal order.

# I

On October 1, 1954, Gary Anderson was born in England to Mavis Sinclair, a citizen of that country, and Henry Gitelman, a U.S. citizen serving there as a member of the U.S. Air Force. Sinclair's parents refused to permit their daughter to marry Gitelman, and Gitelman's name did not appear on Anderson's birth certificate. Nor was Gitelman present for Anderson's birth, although he subsequently visited the mother and child in the hospital and paid for the birth expenses. Gitelman eventually returned to Massachusetts, where he lived at least until Anderson's twenty-first birthday. He had no subsequent contact with Anderson until 1999 or 2000, when he signed an affidavit stating that he was Anderson's father. He later testified to that effect in Immigration Court. At no time has Gitelman ever denied being Anderson's father.

In 1964, meanwhile, Sinclair married another U.S. citizen —Ted Anderson. Two years later, Sinclair's son, Gary, moved from England to the United States to live with his mother and her husband in Michigan. A year after that, Ted Anderson adopted Gary, who became a lawful permanent resident of the United States and took his stepfather's name. Gary Anderson resided in Michigan from 1966 until 1971 or 1972 and Minnesota from then until July 1975, three months before his twenty-first birthday, when he moved to Arizona. He remained in Arizona through his twenty-first birthday and beyond.

In 1996, Anderson was convicted by plea in the U.S. District Court for the District of Minnesota of conspiracy to dis-

tribute and possession with intent to distribute methamphetamine, in violation of 21 U.S.C. §§ 841(b)(1)(A), 846. In September 2000, the former Immigration and Naturalization Service ("INS") served him with a Notice to Appear ("NTA") on the basis of the conviction, charging him with removability under 8 U.S.C. § 1227(a)(2)(B)(i), as an alien convicted of a controlled substance offense, and under 8 U.S.C. § 1227(a)(2)(A)(iii), as an alien convicted of an aggravated felony offense of drug trafficking. In removal proceedings, Anderson admitted the fact of his conviction. On January 11, 2001, however, an Immigration Judge ("IJ") terminated the proceedings, finding that Anderson had acquired U.S. citizenship through his natural father, Gitelman. The IJ did not address whether Anderson would be removable if he were not a citizen.

The INS appealed, and on June 22, 2001, the Board of Immigration Appeals ("BIA") reversed. Rather than remanding for the IJ to address whether Anderson was removable, the BIA simply found that he was and ordered that he be removed to England. Although Anderson asserts that he believed that his then-counsel had filed a petition for review, none was filed until October 16, 2007. This petition for review, No. 07-74042, is the first of those consolidated here.

In the meantime, on October 19, 2001, Anderson filed a petition for a writ of habeas corpus in the U.S. District Court for the Eastern District of California. On March 11, 2003, the district court dismissed the petition without prejudice, holding that it lacked jurisdiction because Anderson had failed to petition for review of the BIA's decision and that the petition could not be transferred to this court because it was not filed until after the deadline for a petition for review. Anderson did not appeal the district court's denial of his habeas petition.

On June 26, 2008, Anderson filed a motion to reopen with the BIA. On August 14, 2008, the BIA denied the motion to reopen and declined to exercise its power to reopen the pro-

ceedings sua sponte. Anderson's timely petition for review of this decision, No. 08-73946, is the second of those consolidated here.

After this court consolidated the two petitions, the government moved to transfer No. 08-73946 to the U.S. District Court for the Eastern District of California under 8 U.S.C. § 1252(b)(5)(B), for a determination of genuine issues of material fact regarding Anderson's citizenship claim. On August 17, 2009, a motions panel granted the motion—severing the petitions, holding both in abeyance, and transferring No. 08-73946 to the district court. On April 27, 2010, the district court held that Anderson had failed to meet his burden of showing that he was a U.S. citizen. *Anderson v. Holder*, No. CIV. 2:09-2519 WBS JFM, 2010 WL 1734979 (E.D. Cal. Apr. 27, 2010).

Anderson filed a timely appeal, docketed as No. 10-16491, and we consolidated it with the two petitions for review. The separate appeal was unnecessary, however, because we never relinquished jurisdiction over No. 08-73946 when we transferred it for a limited purpose to the district court. *See Demirchyan v. Holder*, 641 F.3d 1141, 1143 (9th Cir. 2011) ("[W]e see no meaningful distinction between transfer under 8 U.S.C. § 1252(b)(5)(B) and limited remand."). In fact, it is doubtful that the district court's findings of fact and conclusions of law were separately appealable at all. *Cf. Campbell v. Blodgett*, 998 F.2d 763 (9th Cir. 1993) (en banc) (holding that findings and conclusions on limited remand are not separately appealable). We therefore dismiss as moot the appeal in No. 10-16491, treating it as merged with the petition for review in No. 08-73946.[1]

---

[1]During briefing, Anderson submitted two motions for judicial notice. The first requests that we take notice of excerpts from a Senate Report. Legislative history is properly a subject of judicial notice. *See Chaker v. Crogan*, 428 F.3d 1215, 1223 n.8 (9th Cir. 2005). The second requests that we take notice of U.S. Citizenship and Immigration Services Interpretation

## II

We begin by determining whether we have jurisdiction to decide the petitions for review. *Andersen v. United States*, 298 F.3d 804, 807 n.2 (9th Cir. 2002).

First, we conclude that we lack jurisdiction over the petition in No. 07-74042, because Anderson filed it more than six years after the statutory deadline. The thirty-day time limit for filing a petition for review, under 8 U.S.C. § 1252(b)(1), "is mandatory and jurisdictional, and cannot be tolled." *Singh v. INS*, 315 F.3d 1186, 1188 (9th Cir. 2003). We therefore dismiss that petition for lack of jurisdiction.

**[1]** Second, we observe a potential jurisdictional problem with respect to the remaining petition for review: the BIA's original decision in this case was *ultra vires*. Because the IJ terminated proceedings after finding that Anderson had presented sufficient evidence of his citizenship to prevent the INS from establishing alienage, the IJ never actually found that Anderson was removable. On appeal to the BIA, the Board, after reversing the IJ's determination that Anderson was a citizen, failed to remand for the IJ to determine his removability; it simply entered a finding of removability on its own. Under the immigration statute, however, "only an IJ (or another administrative officer designated by the Attorney General, a provision not applicable here), may issue orders of deportation. The BIA . . . is restricted to affirming such orders, not issuing them in the first instance." *Noriega-Lopez v. Ashcroft*, 335 F.3d 874, 883 (9th Cir. 2003). Any removal order that the BIA purports to enter in the first instance is, " 'in essence, a

No. 309.1. We "may take judicial notice of 'records and reports of administrative bodies.' " *Mack v. South Bay Beer Distributors, Inc.*, 798 F.2d 1279, 1282 (9th Cir. 1986), *overruled on other grounds by Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104 (1991). Accordingly, we grant both motions for judicial notice.

legal nullity,' " *id.* at 884, and may not lawfully be imple-
mented.[2] The question remains, however, whether the removal
order here—even if it is "a legal nullity" as a result of the
agency's failure to follow the appropriate procedures for
entering it—is nonetheless "a final order of removal" for the
purpose of conferring jurisdiction under 8 U.S.C. § 1252(a).

In two cases, we have stated that removal orders entered by
the BIA in the first instance were not "final orders of remov-
al" for jurisdictional purposes. *See Molina-Camacho v. Ash-
croft*, 393 F.3d 937, 942 (9th Cir. 2004) ("Because the BIA
chose not to remand to the IJ for the issuance of the order, no
final order of removal exists in this case that would provide
jurisdiction for this court under § 1252."); *Lolong v. Gon-
zales*, 484 F.3d 1173, 1176 (9th Cir. 2007) (en banc)
("Because our jurisdiction is limited to the review of final
orders of removal, 8 U.S.C. § 1252(a), [*Noriega-Lopez*] held
that, where the BIA issues an order of removal in the first
instance, there is no valid final order of removal and conse-
quently no jurisdiction in this court to review that legal nulli-
ty."). Because the REAL ID Act of 2005 eliminated habeas
review of removal orders, leaving petitions for review as the
exclusive means to challenge such orders, the absence of any
§ 1252 jurisdiction over *ultra vires* removal orders threatens
to create a serious constitutional problem. As the en banc
court observed in *Lolong*, "[t]his limbo—in which the peti-
tioner is subject to a void order of removal but has no judicial
remedy—may raise serious constitutional concerns because
the Suspension Clause 'unquestionably' requires 'some judi-

---

[2]We reject the government's arguments that the BIA's removal order
was not *ultra vires*. The government argues—as did the BIA in denying
the motion to reopen—that *Noriega-Lopez*, decided two years after the ini-
tial decision by the BIA, had no retroactive effect. This is incorrect.
*Noriega-Lopez* did not change the law in any way; it explained that "the
*present statute* specifies in no uncertain terms that it is IJs who are to issue
administrative orders of removal in the first instance." 335 F.3d at 884
(emphasis added). In other words, the court simply stated what the statute
had always permitted (or forbidden) the BIA to do.

cial intervention in deportation cases.' " *Id.* at 1177.[3] Anderson's claim of U.S. citizenship raises another constitutional concern, because the Constitution "mandates that any person with a non-frivolous claim to American citizenship receive a judicial evaluation of that claim." *Rivera v. Ashcroft*, 394 F.3d 1129, 1136 (9th Cir. 2004), *superseded by statute on other* grounds, REAL ID Act, Pub. L. No. 109-13, 119 Stat. 231, § 106(c) (2005).[4] As the Supreme Court has held,

> To deport one who so claims to be a citizen obviously deprives him of liberty . . . . It may result also in loss of both property and life, or of all that makes life worth living. Against the danger of such deprivation without the sanction afforded by judicial proceedings, the Fifth Amendment affords protection in its guarantee of due process of law.

*Ng Fung Ho v. White*, 259 U.S. 276, 284-85 (1922). To find that we lack jurisdiction to review Anderson's constitutional claim would abrogate our role because this court, not the agency, is the final arbiter of constitutional matters. *See Gomez-Chavez v. Perryman*, 308 F.3d 796, 800 (7th Cir. 2002) ("[T]he agency does not have the 'final say on constitutional matters'; instead that power rests with the courts.").

As in *Lolong*, however, we postpone to another day resolution of the constitutional problem that would be raised by the absence of a "final order," because the removal order before us *is* "final" for the purpose of conferring § 1252 jurisdiction. In neither *Molina-Camacho* nor *Lolong* had the agency actu-

---

[3]The filing of a petition for review from the BIA's denial of a motion to reopen cannot on its own cure the jurisdictional deficiency, because "our jurisdiction over a motion to reopen is derivative of our jurisdiction over the underlying order of removal." *Alcala v. Holder*, 563 F.3d 1009, 1014 (9th Cir. 2009).

[4]This concern is based in part on "the principle that American citizenship must be intentionally relinquished." *Iasu v. Smith*, 511 F.3d 881, 886 (9th Cir. 2007).

ally *executed* the removal order in question. We issued a stay of removal in both cases. That is not true here: Anderson, a United States citizen, was removed from the United States pursuant to the BIA's *ultra vires* order in September 2004. Although the removal order may have been "a legal nullity" in a technical or abstract sense, its practical and concrete effect has been to deprive a United States citizen for more than seven years of his right to reside in this country. The order has, in other words, been *treated* as a final order of removal by the agency officials who executed it, and it has certainly been experienced as a final order of removal by the citizen who has been forced from his homeland. It is, in short, tantamount to a final order. To suggest in such circumstances that we nonetheless cannot *review* the removal of a United States citizen and the bar to his return to this country because the order that served as the basis for these actions was not a "final order of removal" would be to wholly disregard the purpose of the immigration laws and the procedures that they envision.

To conclude that we lack jurisdiction because the underlying removal order is void as *ultra vires* would also conflict with Congress's express provision for review of nationality claims in the courts of appeals by petitions for review. *See* 8 U.S.C. § 1252(b)(5). As we have stated, the plain language of § 1252(b)(5) not only permits but *requires* us to evaluate a claim to United States nationality upon a petition for review, even where our jurisdiction would otherwise be limited. *See Hughes v. Ashcroft*, 255 F.3d 752, 755 (9th Cir. 2001). An order of removal issued against a U.S. citizen is always *ultra vires* and void, because the agency has no jurisdiction to order citizens removed: "Jurisdiction in the executive to order deportation exists only if the person arrested is an alien." *Ng Fung Ho*, 259 U.S. at 284. Nonetheless, § 1252(b)(5) clearly provides for review of such orders. *See Theagene v. Gonzales*, 411 F.3d 1107, 1110 n.4 (9th Cir. 2005) ("8 U.S.C. § 1252(b)(5) appears, by providing for de novo review of [citizenship], to provide a fail safe against inadvertent or unin-

formed execution of a final order of removal against a person with a claim to United States nationality.").

**[2]** We therefore hold that a removal order that has been executed against a U.S. citizen is "a final order of removal" within the meaning of § 1252(a). Any hesitance that we might otherwise have in adopting that interpretation is more than offset by our obligation to read the statute, where possible, so as to avoid serious constitutional problems. *See INS v. St. Cyr*, 533 U.S. 289, 299-300 (2001).

## III

Having concluded that we possess jurisdiction to address it, we now turn to the main question in this appeal: whether Anderson derived U.S. citizenship through his biological father, Henry Gitelman.[5] We review the question of citizenship de novo. *Solis-Espinoza v. Gonzales*, 401 F.3d 1090, 1092 (9th Cir. 2005).[6]

---

[5]Anderson also argues that he is entitled to citizenship by virtue of his adoption. Under Former § 1407, however, Gary Anderson cannot be entitled to citizenship through Ted Anderson unless Ted had, at the time of Gary's birth, been "physically present in the United States or its outlying possessions for a period or periods totaling not less than ten years, at least five of which were after attaining the age of fourteen years." Gary concedes that he "was born when Ted Anderson was only eighteen years old"; Ted's satisfaction of § 1407's presence requirement is therefore "legally impossible because he could never under any circumstances have resided in the United States for five years after his fourteenth birthday but before [Gary's] birth." Pet'r Br. at 30. Anderson contends "that this physical presence requirement violates equal protection because a mother, unlike a father, is required to be present in the United States for only one year prior to the child's birth." *Id.* But we held to the contrary in *United States v. Flores-Villar*, 536 F.3d 990 (9th Cir. 2008), and that decision was affirmed by an equally divided Supreme Court. *Flores-Villar v. United States*, 131 S. Ct. 2312 (2011) (mem.). Anderson's equal protection argument is therefore foreclosed.

[6]That the petition for review here is from the denial of a motion to reopen makes no difference in our review of Anderson's citizenship claim. As we held in *Iasu*, we can review the merits of a citizenship claim by way of a petition for review from the denial of a motion to reopen, even where the motion was "untimely" and denied "as procedurally improper." 511 F.3d at 892-93.

**[3]** "The applicable law for transmitting citizenship to a child born abroad when one parent is a U.S. citizen is the statute that was in effect at the time of the child's birth." *Runnett v. Shultz*, 901 F.2d 782, 783 (9th Cir. 1990). The citizenship law in effect at the time of Anderson's birth in 1954 was the one enacted by § 301 of the Immigration and Nationality Act of 1952, Pub. L. No. 82-414, 66 Stat. 163, 236, codified at 8 U.S.C. § 1401(a)(7) (1952). That section ("Former § 1401(a)(7)") conferred U.S. citizenship at birth on any

> person born outside the geographical limits of the United States and its outlying possessions of parents one of whom is an alien, and the other a citizen of the United States who, prior to the birth of such person, was physically present in the United States or its outlying possessions for a period or periods totaling not less than ten years, at least five of which were after attaining the age of fourteen years: *Provided*, That any periods of honorable service in the Armed Forces of the United States by such citizen parent may be included in computing the physical presence requirements of this paragraph.

Under Former § 1409(a), however, Former § 1401(a)(7) covers "a child born out of wedlock" only "if the paternity of such child is established while such child is under the age of twenty-one years by legitimation." Because Gitelman is undisputably Anderson's father, Anderson clearly meets each of the requirements of Former § 1401(a)(7). The key question, then, is whether Anderson's paternity was established by legitimation before he turned twenty-one.

**[4]** We look to 8 U.S.C. § 1101(c)(1) (1952) to determine what law governs the issue of legitimation. This section defines a child (for our purposes) as "an unmarried person under twenty-one years of age," including "a child legitimated under the law of the *child's residence or domicile*, or under the law of the *father's residence or domicile*, whether in the

United States or elsewhere." *Id.* (emphasis added). We must therefore determine whether Anderson's paternity was established by legitimation in a state or country in which he or his father was domiciled before he turned twenty-one. There are five such jurisdictions: Arizona, England, Massachusetts, Michigan, and Minnesota. Because Anderson was domiciled in Arizona before he reached the age of twenty-one, we hold that he derived citizenship from Gitelman under Arizona law; therefore, we do not consider the other four jurisdictions.

**[5]** At the time of Anderson's residency in Arizona, state law had since 1921 provided that "every child is the legitimate child of its natural parents."[7] Clearly, then, Arizona law regarded Anderson as the *legitimate* child of Henry Gitelman. The question remains whether Gitelman's "paternity of" Anderson was "established . . . by *legitimation*," as Former § 1401(a)(7) requires. That question may be further divided into the two that we noted at the outset. First, is there a difference between "legitimation" and the status of being legitimate? Second, was Anderson's paternity (even if undisputed) properly "established" under Arizona law?[8]

---

[7]The history of the provision is complex. It was enacted in 1921 Ariz. Sess. Laws. ch. 114, reading in relevant part as follows: "Every child is hereby declared to be the legitimate child of its natural parents . . . ." *In re Silva's Estate*, 32 Ariz. 573, 575-76 (1927). The provision was codified at § 273 of the Revised Code of 1928, then recodified at § 27-401 of the Arizona Code Annotated of 1939, reading: "Every child is the legitimate child of its natural parents . . . ." *See Imperial v. State*, 65 Ariz. 150, 152 (1947). In 1956, § 27-401 was recodified as § 14-206. On January 1, 1974, § 14-206 was repealed and replaced by §§ 14-2109 and 14-2611. 1983 Ariz. Sess. Laws. ch. 75, § 4. This amendment substantively changed the law in ways that we will discuss later in the opinion. On June 6, 1975, however—a month before Anderson arrived in Arizona—the legislature enacted § 8-601, making it retroactive to December 31, 1973, the last effective date of the former § 14-206. 1975 Ariz. Sess. Laws ch. 117, § 2. The new provision, which remains in effect, reads: "Every child is the legitimate child of its natural parents and is entitled to support and education as if born in lawful wedlock."

[8]The government also suggests that Anderson "does not qualify as a 'child' within the meaning of 8 U.S.C. § 1101(c)(1) (1952), because that

## A

We begin with the first question: whether "legitimation" requires more than the status of being legitimate. Relying heavily on *Flores-Torres v. Holder*, 680 F. Supp. 2d 1099 (N.D. Cal. 2009), the district court held that "legitimation" does differ from " 'legitimacy.' " *Anderson*, 2010 WL 1734979, at *7. " 'Legitimation,' " the court wrote, "denotes a procedure—an act or occurrence that makes a child born out-of-wedlock legitimate under the law," whereas "[a] 'legitimate' child . . . could be either a child born into wedlock or a child born out-of-wedlock who has been legitimated or whom the law deems to be [legitimate]." *Id.* Citing a 1950 Senate report stating that " '[a]s a general proposition, legitimation is accomplished by the marriage of the parents with acknowledgment of paternity by the putative father,' " the court concluded that Congress meant "to require the child's parents to go through some process to acknowledge paternity in order to transfer citizenship to their child." *Id.* (quoting S. Rep. No. 81-1515, at 692-93 (1950)). "It would be a strange result contrary to the intent of Congress," the court wrote, for Anderson to be a citizen "simply because he was fortunate enough to move to Arizona before the age of twenty-one

---

section "requires not only that a person be legitimated before the age of twenty-one, but also that the child be 'in the legal custody of the legitimating . . . parent or parents at the time of such legitimation . . . .' " Gov't Br. at 39-40 n.18. As Anderson points out, however, "USCIS has long recognized that there is an inconsistency between the requirement of Section 1101(c) that a child be legitimated by age sixteen to be considered a 'child' and Section 1409(a), which provides that a child be legitimated by age twenty-one." Reply Br. at 8. USCIS's formal view is that "provisions of the current statute, providing that legitimation occur during minority, operate independently of the definition of legitimated child in section 101(c) of the current Act, and are satisfied by mere legitimation during minority notwithstanding that it occurred after age 16 years, *or that the legitimation parent did no[t] then have legal custody of the child.*" USCIS Interpretation 309.1(b)(2)(i) (emphasis added). The provisions of the current statute, and the conflict between them, are for the relevant purpose the same as those in the 1952 statute.

without his father taking any affirmative steps to acknowledge a paternal relationship with him." *Id.* at *16-*17.

**[6]** Neither the district court's argument nor the government's effort to bolster it is correct as a matter of law. The central flaw in the district court's analysis is its failure to appreciate that states, not the federal government, possess "the power to define what constitutes [legitimacy or illegitimacy], to regulate it, or even to abolish any distinctions founded upon it." *Lau v. Kiley*, 563 F.2d 543, 549 (2d Cir. 1977). It is "[i]ncontestable that each state may formulate its own public policy in respect to legitimation and can enact laws to carry out its policy." *Estate of Lund*, 26 Cal. 2d 472, 485-86 (1945). If a state defines "legitimation" in a manner that entails no formal process, as Arizona did, then the federal courts must apply the state's definition. Other language in the 1950 Senate Report, moreover, contravenes the district court's inference that legitimation requires a formal *act*: the report's reference to the "establishment of legitimation," S. Rep. No. 81-1515, at 692, implies that "legitimation" can refer to the status of being legitimate, not an act that creates legitimacy.[9]

---

[9]Even if *Flores-Torres* were binding, moreover, it does not mean what the district court read it to mean. The Salvadoran petitioner in that case was entitled to citizenship if his paternity had *not* been established by legitimation when his mother became a U.S. citizen. 680 F. Supp. at 1103. Salvadoran law "distinguished among (i) 'legitimate children' who were born in wedlock, (ii) 'natural children' who were born out of wedlock but whose paternity was acknowledged by their fathers and (iii) 'illegitimate children' who were born out of wedlock and whose paternity was not acknowledged by their fathers." *Id.* at 1102. Under the law, "an illegitimate or natural child could be legitimated only if his parents entered into a lawful marriage after his birth." *Id. Legitimation* (through marriage), however, was only one means of establishing paternity. The law "described several methods by which the father could acknowledge paternity of a child born out of wedlock." One such method, used in the petitioner's case, "was for the father to submit to the Salvadoran civil registry the information from the child's birth certificate and a signed certification acknowledging his paternity." *Id.* In holding that "[t]he word 'by' indi-

**[7]** In multiple cases, federal courts of appeals and the BIA have held that statutes abolishing the distinction between legitimate and illegitimate children suffice to meet the requirement of "legitimation." In *Lau*, for example, the Second Circuit considered whether a child had been "legitimated" under Chinese law, for the purpose of a federal statute requiring that "such legitimation take[ ] place before the child reaches the age of eighteen years," 8 U.S.C. § 1101(b)(1) (1970), where the relevant Chinese statute provided that "[c]hildren born out of wedlock shall enjoy the same rights as children born in lawful wedlock," 563 F.2d at 544. The government contended, as it does here, that the statute "require[d] an *act* of legitimation under the applicable law, not just a factual determination that the relationship of father and son exists." *Id.* at 548 (quoting the government's brief) (emphasis added). The court rejected that argument, however, holding that because "Chinese law makes all children 'legitimate.' " it was unnecessary to "consider . . . whether there is a procedure in China for 'legitimating' a child." *Id.* at 551. The BIA subsequently agreed with this holding. *Matter of Wong*, 16 I. & N. Dec. 646 (BIA 1978). A few years later, it stated the holding in more general terms: "When the country where a beneficiary was born and resides eliminates all legal distinctions between legitimate and illegitimate children, all natural children are deemed to be the legitimate or legitimated offspring of their natural father from the time that country's laws are changed." *Matter of Hernandez*, 19 I. & N. Dec. 14 (BIA 1983).

Much more recently, the Third Circuit held in *Brandao v. Attorney General of the United States*, 654 F.3d 427 (3d Cir.

cates that legitimation must be the means through which paternity was established," *id.* at 1105, *Flores-Torres* meant that the petitioner's paternity had to have been established by legitimation, *as opposed to* the alternative mechanism of acknowledgment, for him to fall within the terms of the statute. Legitimation need not *always* requires some formal legal act; the question is whether or not the law of the governing jurisdiction requires such a formality.

2011), that a child's "paternity" had been "established by legitimation" for the purposes of 8 U.S.C. § 1432(a) (1994), under a Cape Verde law providing that "all children are considered equal" and "enjoy the same rights" no matter whether their parents are married or unmarried, *id.* at 429. Applying the rule that the BIA stated in *Hernandez,* the court concluded that the petitioner had been legitimated, because Cape Verde's statute rendered every child "legitimated regardless of whether the natural father takes formal steps to assert paternity." *Id.* at 430. Our own court issued a similar holding in *Romero-Mendoza v. Holder*, 665 F.3d 1105 (9th Cir. 2011). *Romero-Mendoza* applies the BIA's holding in *Matter of Moraga*, 23 I. & N. Dec. 195 (BIA 2001)—which itself relied on *Hernandez* and *Wong*, *id.* at 199—to hold that "[w]hen legal distinctions are eliminated between children born to married parents and those born out of wedlock, the children born out of wedlock are deemed to be legitimated as of the date the laws are changed." 665 F.3d at 1109.

The government attempted to distinguish *Brandao* at oral argument, and presumably would distinguish *Romero-Mendoza* as well, on the basis that the statute at issue—which conferred citizenship on a child born outside the United States to unmarried alien parents, upon "the naturalization of the mother," so long as the child's paternity had "*not* been established by legitimation"—was meant to "provide[ ] the broadest protection possible for the alien parent's rights." *Brandao*, 654 F.3d at 429-30. In other words, the government's position is that the word "legitimation" should be read broadly when a broad reading results in the denial of citizenship, and narrowly when a narrow reading results in the denial of citizenship. *Compare* Gov't Br. at 41 (dismissing as "unavailing" Anderson's argument "that he was legitimated under Arizona law because Arizona does not distinguish between legitimate and illegitimate children") *with* Brief for Respondent at 14, *Romero-Mendoza v. Holder* (No. 08-74674) (citing *Lau* and urging deference to *Moraga*'s holding "that '[w]hen a country where a beneficiary was born and resides eliminates all legal

distinctions between children born in wedlock and children born out of wedlock, all natural children are deemed to be the legitimate or legitimated offspring of their natural father from the time that country's laws are changed' "). Not only does the government's position fail to explain why an alien parent's rights are more worthy of statutory protection than the citizenship interests of someone who spent the vast majority of his life in the United States; it defies the government's own prior assertion that the statute at issue in *Brandao*, *Romero-Mendoza*, and *Flores-Torres* closely resembles the one at issue here. *See* Gov't Br. at 41-42. The government's position is unfair as well as erroneous.

The Congress that enacted the 1952 citizenship statute might well have been surprised to learn that states would confer legitimacy without the need for formal action, although the Arizona law in question had been effective since 1921. The government is likely correct that "the type of action Congress expected was 'the marriage of the parents with acknowledgment of paternity by the putative father,' or a formal 'adjudication of a competent court.' " Gov't Br. at 37 (quoting S. Rep. No. 81-1515, at 692). Indeed, as the Supreme Court noted in upholding the constitutionality of a 1986 amendment to the citizenship statute, some degree of formality makes sense as a policy matter: "the requirement that the father make a timely written acknowledgment under oath, or that the child obtain a court adjudication of paternity, produces the rough equivalent of the documentation that is already available to evidence the blood relationship between the mother and the child." *Miller v. Albright*, 523 U.S. 420, 436 (1998).

Contrary to the government's contention at oral argument, however, neither *Miller* nor its successor, *Nguyen v. INS*, 533 U.S. 53 (2001), authorizes us to read into the statute a requirement of formal action that the statute simply does not contain. These cases dealt not with the *interpretation* of the citizenship statute but with its *constitutionality*. They involved a provision added to the INA in 1986, replacing Former § 1409(a),

which enabled a child born abroad to an unmarried U.S. citizen father to qualify for citizenship if, among other requirements, "(1) such child is legitimated under the law of the child's residence or domicile, *or* (2) the father acknowledges paternity of the child in writing under oath, *or* (3) paternity of the child is established by adjudication of a competent court." Immigration and Nationality Act Amendments of 1986, Pub. L. No. 99-653, 100 Stat. 3655, § 13(b) (emphasis added).[10] Both decisions upheld this requirement against an equal protection challenge—in *Miller*, by a deeply fractured set of opinions with no majority; in *Nguyen*, by a five-to-four majority—because it served legitimate governmental interests. These interests included one that is not at stake here ("assuring that a biological parent-child relationship exists," *Nguyen*, 533 U.S. at 62), as well as one on which the government focused at oral argument:

> the determination to ensure that the child and the citizen parent have some demonstrated opportunity or potential to develop not just a relationship that is recognized, as a formal matter, by the law, but one that consists of the real, everyday ties that provide a connection between child and citizen parent and, in turn, the United States.

*Id.* at 64-65. The fact that such a consideration might legitimately have motivated Congress to enact requirements of formal action in 1986 hardly helps, however, to resolve the question of statutory meaning before us: whether the 1952 statute, which on its face contains *no* requirement of formal action, should nonetheless be read to contain one. Our resolu-

---

[10]As Justice Stevens explained in *Miller*, "[t]he purpose of the amendment was to 'simplify and facilitate determinations of acquisition of citizenship by children born out of wedlock to an American citizen father, by eliminating the necessity of determining the father's residence or domicile and establishing satisfaction of the legitimation provisions of the jurisdiction.' Hearings, at 150." *Miller*, 523 U.S. at 436.

tion of that question is guided not by *Miller* and *Nguyen* but by the plain language of the statute and by the multiple decisions, discussed above, that have treated the abolition of a distinction between legitimate and illegitimate children as sufficient to establish legitimation.

[8] Even if we would otherwise be inclined to read an unwritten requirement of formal action into the 1952 statute, such an interpretation would make no sense at all in the context of Arizona's statutory scheme, which specifies no formal mechanism of legitimation whatsoever. The government does not explain, and we cannot imagine, what formal action Anderson or his parents could have taken to make him legitimate under Arizona law, even had they wanted to do so. Twisting the terms of the Arizona legitimacy statute to require some unspecified formal act not only defies the state legislature; it imposes a Kafkaesque requirement to undertake a formal process that does not exist. It was likely for these reasons that another district court properly read the Arizona statute to render a child "legitimated" by virtue of his birth, recognizing no distinction between the status of "legitimacy" and that of having been "legiti*mated.*" *See O'Donovan-Conlin v. U.S. Dep't of State*, 255 F. Supp. 2d 1075, 1082 (N.D. Cal. 2003) ("Since plaintiff O'Donovan-Coin is undisputedly the son of Heather O'Donovan and Coin, and because Coin is a resident of Arizona, O'Donovan-Coin has been legitimated under the state law of Arizona."). There is no question that Anderson is legitimate and thus legitimated under Arizona law.

The government objects that "*O'Donovan-Conlin* dealt with the *current* version of 8 U.S.C. § 1409, which lacks the requirement that a child's *paternity* have been established by legitimation." Gov't Br. at 44-45. This argument, however, does not undercut Anderson's *legitimacy*. It merely raises the second question before us: whether, even if Anderson was *legitimated* under Arizona law, Gitelman's *paternity* was established by legitimation. We turn to that question next.

**B**

It is clear that "Gitelman took no steps to establish his paternity, by legitimation or otherwise, before petitioner's twenty-first birthday." 2010 WL 1734979, at *8. The only question is whether Arizona law *required* the biological father (or the mother or child) to take some formal "step" in order for paternity to be established, where the identity of the child's biological father was undisputed and the mother had no need to compel support payments.

Our consideration of this question is made no easier by the parties' failure to refer us to the relevant sources of law. Anderson asserts that Gitelman's paternity of him "is undisputed," Reply Br. at 2, and that Gitelman publicly acknowledged having fathered Anderson at the time of his birth, Reply Br. at 6. He makes these assertions, however, without showing why they support his having established paternity under Arizona law. The government, meanwhile, argues that "Gitelman never established paternity" because "[h]is name was not on Anderson's birth certificate, he provided no financial support for Anderson (apart from the stroller and hospital expenses he paid for immediately after Anderson's birth), he never filed a lawsuit to establish his paternity, and he never lived with Anderson." Gov't Br. at 44—but it, too, fails to explain how those facts relate to the establishment of paternity under Arizona law.

**[9]** In our view, the question of paternity is ultimately a simple one: Anderson's paternity is established by the very statute that establishes his legitimacy. That statute provides, as discussed earlier, that "[e]very child is the legitimate child of its natural parents." Ariz. Rev. Stat. § 8-601. There is no dispute that Gitelman is Anderson's natural father. The statute therefore provides, literally, that Anderson is Gitelman's legitimate child. If there were a dispute as to the identity of Anderson's biological father, then the provisions of Arizona law concerning judicial paternity determinations (which we

discuss below) would become relevant. Where the identity of a child's natural parents is clear, however, the same statute that establishes the child's legitimacy also establishes its parentage under state law.

Our interpretation of § 8-601 is bolstered by an analysis of its history. We noted earlier, *supra* note 7, that for roughly a year and a half—between January 1, 1974 and June 6, 1975, a month before Anderson's arrival in the state—Arizona law did *not* provide that "every child is the legitimate child of its natural parents." Instead, the statute in effect during this period provided in relevant part as follows:

> If, for purposes of intestate succession, a relationship of parent and child must be established . . .
>
> > 2. In cases not [concerning adoptions], a person born out of wedlock is a child of the *mother*. That person is also a child of the *father*, if either
> >
> > > (a) The natural parents participated in a marriage ceremony before or after the birth of the child, even though the attempted marriage is void.
> > >
> > > (b) The paternity is established by an adjudication before the death of the father or is established thereafter by clear and convincing proof . . . .

Ariz. Rev. Stat. § 14-2109 (1975) (emphasis added). During this brief interregnum, Anderson's paternity would not have been established by the legitimacy statute alone; it would have required either the marriage of his parents or a judicial declaration. Breaking from more than five decades of statutory precedent, § 14-2109 distinguished between the estab-

lishment of *maternity*, which required no formal action, and the establishment of *paternity*, which did.

In June 1975, however, the Arizona legislature repudiated this brief departure from its longstanding rule that "every child is the legitimate child of its natural parents." The legislature not only reasserted that longstanding rule but made it retroactive to the day before § 14-2109 had gone into effect. 1975 Ariz. Sess. Laws ch. 117, § 2.[11] The clear purpose and effect of this change was to restore parity between mothers and fathers under the legitimation statute—to *remove* the provisions requiring formal action for the establishment of paternity and reassert the longstanding rule that any child born in Arizona was the legitimate child of its father as well as its mother.

One might wonder why, if the statute that legitimated Anderson served also to establish his paternity, Arizona law contains other provisions that specifically govern the question of paternity. The code in effect during Anderson's residency in Arizona provided for judicial proceedings to establish paternity. *See* Ariz. Rev. Stat. § 12-841 to -851 (1956 & Supp. 1957-79). So did the 1921 law that contained the legitimacy provision at issue here. *In re Silva's Estate*, 32 Ariz. at 576. Such a formal process, however, was presumably to be used only when paternity was *disputed*—where, in other words, the identity of a child's natural father was not clear. Absent the need to determine a disputed question of paternity, so as to compel a father to comply with his legal obligations, no one would bother to file a judicial paternity action.

The Arizona Supreme Court agreed with this view in *Silva's Estate*. Referring to the statutory provision for paternity actions, cited above, it wrote:

---

[11]The legislature did not actually repeal this version of § 14-2109 until 1994. *See* 1994 Ariz. Sess. Laws ch. 290, § 5.

> We do not intend that it be understood that we think such procedure is exclusive, and that a child born out of wedlock cannot be legitimized except by an action instituted by the mother, or a statement in writing made by the parents admitting its parentage. It seems to us that the evident purpose of authorizing the mother to bring an action to establish the parentage of her child was to fix the father's legal *obligation* to support and educate the child. This must be so since section 3 makes such action a cumulative remedy to the action under the bastardy statute, the purpose of which is to *compel* the father to contribute to the support of his illegitimate offspring.

*Id.* at 579 (emphasis added). In other words, the court held that a child could be "the legitimate child of its natural parents," even without a formal action to establish who those parents were, so long as there was no need to compel parental support. Where the identity of a child's parents was clear, in the court's view, the child's legitimation could not require the formality of a judicial action or written acknowledgment.

A related statute in effect at the time of Anderson's residency, Ariz. Rev. Stat. § 12-621 (1956 & Supp. 1957-79), provided that "[w]hen a person desires to establish his . . . parentage," he could "file . . . an application setting forth his reasons for" so desiring, upon which a court could "enter judgment establishing . . . parentage." This process resembles a paternity action except that it is non-adversarial and may be initiated by the child. It might, then, be more appropriate for use by a child—such as Anderson—who wanted to establish his paternity for reasons unrelated to the compulsion of support.

In a 1975 decision, however, the Arizona Supreme Court explained why this *ex parte* process was closely related to a paternity action and held that it was equally unnecessary where there was no need to compel support from a child's

biological father. The case involved a child who was entitled to inherit unless estopped by laches. The defendants argued a) that the child's mother's failure to file a paternity action estopped the child from alleging paternity in probate, and b) that the child's own failure to seek a declaration of her paternity under what became § 12-621 had a similar effect. The court found "no merit to either contention," explaining that *Silva's Estate* had "made it clear" that the use of a formal judicial process for establishing paternity "was not exclusive, and that the primary purpose of the legislation was to fix the father's *obligation* to support and educate the child." *In re Cook's Estate*, 63 Ariz. 78, 86-87 (1975) (emphasis added). "It would be unwarranted," the court explained,

> to hold that the beneficent provisions of Sec. 27-401 [making all children legitimate] could be nullified by reason of the failure of either the mother or the child to timely establish parenthood and thereby bastardize the child whom the legislature had declared to be legitimate with the right of inheritance as though born in wedlock.

*Id.* at 87. The court thus reaffirmed its holding in *Silva's Estate*: that the function of any judicial paternity action, adversarial or *ex parte*, is to enforce paternal obligations. Moreover, it read the paternity provisions of Arizona law as *in pari materia* with the provision that all children are legitimate, reasoning that the liberality of the latter ought not be "nullified" by a formalistic interpretation of the former. Taken together, *Silva's Estate* and *Cook's Estate* reject the notion that Anderson's paternity could not have been established without a formal process under Arizona law.

**[10]** There has never been any question that Gitelman is Anderson's natural father. Anderson's paternity was therefore established by Arizona's legitimacy statute, Ariz. Rev. Stat. § 8-601, which declared that Anderson was, in the eyes of the state, "the legitimate child of" Gitelman and his mother.

Because the primary purpose of § 8-601 was to establish legitimacy, we conclude that Anderson's paternity was established *by* legitimation, as Former § 1409(a) requires in order for him to have derived citizenship through Gitelman. We therefore hold that Anderson is a citizen of the United States and that the agency lacked jurisdiction to remove him from the country.

## IV

**[11]** Because we conclude that Anderson is a citizen of the United States, we **GRANT** the petition for review in No. 08-73946 and **REMAND** with instructions for the agency to vacate the removal order against him. For the reasons discussed earlier, we **DISMISS** for lack of jurisdiction the petition for review in No. 07-74042, and we **DISMISS** as moot the appeal in No. 10-16491.